UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID KURTANIDZE,

Plaintiff,

-v-

MIZUHO BANK, LTD.,

Defendant.

---

23 Civ. 8716 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff David Kurtanidze brings this action against his former employer Mizuho Bank, Ltd. ("Mizuho"). Kurtanidze, a white man from Eastern Europe, alleges that Mizuho discriminated against him on the basis of his race, his national origin, his gender, his familial status (as father of three children), his caregiver status (as primary caregiver for his children and his father), and his disabilities. He further alleges that Mizuho retaliated against him for seeking to exercise his rights to various forms of leave and complaining about ongoing discrimination based on race and national origin. In this case, he brings claims under 42 U.S.C. § 1981; the Family and Medical Leave Act, 29 U.S.C. § 2612 ("FMLA"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-502(a) *et seq.* ("NYCHRL"); the New York Labor Law, N.Y. Lab Law §§ 650 *et seq.* ("NYLL"); and New York common law.

Pending now is Mizuho's partial motion to dismiss Kurtanidze's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). Mizuho moves to dismiss all claims except for those alleging disability discrimination in violation of the NYSHRL and NYCHRL, which Mizuho seeks to narrow based on the statute of limitations.

1

For the reasons that follow, the Court grants Mizuho's motion to dismiss in part and denies it in part.  The Court orders as follows:

- The FAC's Section 1981 discrimination claim is narrowed to the issue of Kurtanidze's termination.

- The FAC's Section 1981 retaliation claim is dismissed.

- The FAC's NYSHRL and NYCHRL retaliation claims based on race and national origin are dismissed.

- The FAC's NYSHRL and NYCHRL discrimination and retaliation claims based on familial status are dismissed.

- The FAC's NYLL claim is dismissed.

- The FAC's FMLA interference claim is narrowed to leave requests denied on or after August 8, 2020.

- The FAC's FMLA retaliation claim is narrowed to adverse employment actions taken on or after August 8, 2020.

- The FAC's breach of contract claim is dismissed.

The Court otherwise denies the motion to dismiss.

## I.    Background[1]

### A.    Factual Background

#### 1.    The Parties

Kurtanidze was born and raised in the Eastern European country of Georgia.  FAC ¶ 7. On unspecified dates, he emigrated to, and became a citizen of, the United States.  *Id.* ¶ 2.  He

---

[1] The Court draws the facts in this decision principally from the First Amended Complaint, Dkt. 24 ("FAC").  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district

lives in New Jersey. *See id.* ¶¶ 71, 80. He writes and speaks English fluently, and speaks with an Eastern European accent. *Id.* ¶ 7.

Mizuho Bank, Ltd. is a global bank, headquartered and incorporated in Japan. *Id.* ¶ 8. It employs more than 2,000 people worldwide. *Id.*

### 2. Kurtanidze's Employment at Mizuho

On January 7, 2017, Mizuho hired Kurtanidze, a certified public accountant, "for a position in Regulatory Reporting Automation within the Finance Change Group." *Id.* ¶¶ 10–11. His employment at Mizuho continued until his termination on April 6, 2021. *Id.* ¶ 87. Because Kurtanidze alleges that he was subjected to several forms of discrimination and retaliation throughout his time at Mizuho, the Court reviews the allegations as to each in turn.

#### a. *Alleged discrimination based on race and national origin*

The FAC pleads the following incidents and remarks that it alleges reflect discrimination based on Kurtanidze's race and his Georgian national origin.

First, the FAC alleges Kurtanidze was denied the opportunity to apply for promotions based on his race and national origin. In April 2018, despite his being "extremely qualified" to lead his team, "there was no opportunity for him, or his non-Japanese [c]o-worker [Irene] Shum, to apply for" a promotion to a vacant role in management "because they were Americans and he was white." *Id.* ¶ 20. The FAC alleges "[u]pon information and belief" that "Head of Group [Kenichi] Matsumoto made the promotion decisions," and that Matsumoto "favored Japanese nationals for advancement over non-Japanese employees, regardless of qualifications or merit."

---

court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as true, drawing all reasonable inferences in Kurtanidze's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

*Id.* ¶ 22. Matsumoto's bias was evident in that he "rarely spoke to any non-Japanese employees, even ignoring a 'good morning,' unless it was a Japanese employee who greeted him." *Id.* ¶ 16. Kurtanidze "was not permitted to apply" for another promotion in September 2019, again "because he was not Japanese." *Id.* ¶ 42.

Second, the FAC alleges Kurtanidze was denied the opportunity to transfer within Mizuho based on his race and national origin. In September 2019, Kurtanidze "applied for an opening within a different group" at Mizuho. *Id.* ¶ 44. Despite "follow[ing] up numerous times" with human resources, he "received no response until he was informed that the position was filled by an outside consultant." *Id.* The FAC alleges "[u]pon information and belief" that Kurtanidze "would have been assigned the position" had he been Japanese. *Id.* ¶ 45. For support, the FAC notes two comparators, Tanya Hamer, and Hamer's manager, whom the FAC does not identify by name. *See id.* ¶ 47. Hamer and her manager—neither Japanese—worked at Mizuho for 16 and 20 years, respectively, and were "consistently denied promotion opportunities." *Id.*

Third, the FAC notes Mizuho's employees' use of Japanese to communicate. Kurtanidze observed "that all important corporate issues were discussed exclusively in Japanese, even when non-Japanese speaking employees were present." *Id.* ¶ 21. Meetings were often "held exclusively in Japanese," such that Kurtanidze "could not participate in the meetings or even learn about [Mizuho's] priorities from listening to the meetings." *Id.* ¶ 37.

Fourth, the FAC alleges that two Mizuho managers, Satoshi Kinoshita and Jumpei Yoshida, both Japanese, mistreated Kurtanidze based on his race and national origin. Kinoshita objected to Kurtanidze's "Georgian-accented English," and instead assigned an American co-worker of Chinese descent "to speak at meetings in [Kurtanidze's] stead, because her 'English

was more clear.'" *Id.* ¶ 23.  Kinoshita further told Kurtanidze "that he should take courses on how to become 'more like a Japanese employee.'" *Id.* ¶ 36.  As to Yoshida, in late 2019, Kurtanidze observed that Yoshida "was very respectful and friendly to Japanese employees and blatantly disrespectful and cold to non-Japanese employees." *Id.* ¶ 51.  Yoshida "carried around a journal in which he would make notations if an employee—usually a non-Japanese, non-Asian employee—was late or made small mistakes." *Id.* ¶ 53.  Around the same time, Kurtanidze was unfairly blamed by Yoshida for the "failure" of a technical project. *Id.* ¶ 56.  When Kurtanidze told Yoshida that the project only failed because his co-worker, Junko Tamagawa, "doesn't want to listen to my instructions because of my ethnicity," Yoshida's "response was a dismissive, 'You know how Junko is.'" *Id.* ¶ 57.  As such, Yoshida condoned "Tamagawa's refusal to work with non-Japanese, non-Asian employees." *Id.*  "[O]ther non-Japanese, non-Asian employees" in the "IT department" told Kurtanidze that "[t]hey experienced similar discrimination by" Tamagawa. *Id.* ¶ 58.

         *b.*     *Alleged discrimination based on gender, familial status, and caregiver status*

The FAC pleads the following events that it alleges are indicative of discrimination based on Kurtanidze's gender and his status as a caregiver for his children and his father.

First, in early 2019, when Kurtanidze and his wife were expecting their third child, Kurtanidze met with manager Kinoshita to discuss his caregiving obligations. *See id.* ¶¶ 26, 28. Kurtanidze told Kinoshita that, because of medical issues associated with his wife's two previous pregnancies, Kurtanidze would have to act as primary caregiver, at least "until his wife healed sufficiently." *Id.* ¶ 26.  Because Mizuho "limited male employees to only eight weeks of paid paternity leave," *id.* ¶ 27, Kurtanidze asked for a special dispensation to receive more than eight weeks of leave to care for his children, *id.* ¶ 28.  Kinoshita denied Kurtanidze's request because

Kurtanidze "is 'a man and therefore, cannot be the primary caregiver,' and 'the primary caregiver is supposed to be the mother of the children.'" *Id.* ¶ 29.

Second, in June 2019, Kurtanidze "emailed Human Resources to request an extended unpaid leave under the FMLA to help care for his children and his disabled father." *Id.* ¶ 31. Mizuho "denied his request, reiterating that Plaintiff could not be the primary caregiver because he is male, and that [Mizuho] only granted eight weeks of paternity leave, notwithstanding the FMLA." *Id.*

Third, in late December 2019 and early January 2020, after Kurtanidze's son required emergency surgery, Kurtanidze took a day off to care for him. *Id.* ¶ 64. "Although this was an approved day off," Yoshida "inundated [Kurtanidze] with text messages regarding work matters." *Id.* Because Kurtanidze was caring for his son, his responses to Yoshida were delayed, which caused Yoshida to call him "several times to accuse him of being 'irresponsible' . . . and 'abandoning the team.'" *Id.*

Fourth, in early 2020, Kurtanidze "needed FMLA leave to care for his disabled father." *Id.* ¶ 69. "When [Kurtanidze] explained the situation to [Yoshida]," Yoshida allegedly "responded with frustration saying, 'What do I have to do with it? Reach out to HR and see if they will approve.'" *Id.* Although Kurtanidze "emailed Human Resources requesting the leave of absence," he "received no substantive response." *Id.*

      *c.*    *Alleged retaliation based on caregiver status*

The FAC pleads the following two events that it alleges reflect retaliation based on Kurtanidze's attempts to secure leave to serve as a caregiver for his children and his father.

First, in mid-August 2019, when Kurtanidze returned from paternity leave, he noticed that manager "Kinoshita's tone . . . changed drastically," and was now "hostile and

disrespectful," for instance telling Kurtanidze "to stop talking" in meetings. *Id.* ¶ 33.
Kinoshita's comments "made it clear that he was unhappy with [Kurtanidze] having taken any
paternity leave, and having dared to ask for an extended leave." *Id.* "Kinoshita repeatedly told
[Kurtanidze] that the timing of his child's birth cause[d] a lot of 'inconvenience'" to Mizuho. *Id.*

Second, in September 2019, after Kinoshita was promoted, he "did not recommend
[Kurtanidze] as his replacement." *Id.* ¶ 40. This was despite the fact that Kurtanidze "had
worked successfully as a Vice President on the team for two years and received a 'Manager's
Certificate.'" *Id.* The FAC alleges "[u]pon information and belief" that Kinoshita "did not want
to promote . . . any employees who utilized family leave." *Id.*

> d.   *Alleged disability discrimination*

The FAC alleges the following events that it alleges reflect discrimination based on
Kurtanidze's disabilities.

Around the end of 2018, due to strain on Kurtanidze's wrist and back, he "requested an
ergonomic keyboard and mouse, as well as a new headset with pads on both ears." *Id.* ¶ 25.
Mizuho refused to approve the purchase. *Id.* "Instead of engaging in the interactive process to
determine whether an accommodation could enable him to perform his job," an unidentified
employee at Mizuho told Kurtanidze that he "should buy the equipment himself if he really
needed it." *Id.*

Around December 2019, Kurtanidze's condition worsened. He "started feeling numbness
in his right wrist, followed by continuous tension and pressure." *Id.* ¶ 61. He told manager
Yoshida "about his diagnosis and asked for reasonable accommodation in the form of breaks
throughout the day to rest his wrist and intermittent FMLA leave in the form of time off for
physical therapy." *Id.* Yoshida "just smiled at [Kurtanidze] and sarcastically replied, 'Yeah,

sure.'" *Id.* "Yoshida did not allow [Kurtanidze] time to rest his wrist or approve his intermittent leave," and instead told Kurtanidze "that he needed to manage his health issues outside of working hours." *Id.*

In February 2020, after Kurtanidze's condition worsened once more, he "requested an accommodation from [Yoshida] to allow him to pace his work." *Id.* ¶ 71. Because "his request for intermittent FMLA leave had been rejected in the past, [Kurtanidze] asked for the reasonable accommodation of working some of his hours remotely so he could attend physical therapy closer to work or home." *Id.* "Yoshida ignored [Kurtanidze's] request, told him that if he really needed the therapy, he should do it on his own time, and asked about the timing of deliverables." *Id.* ¶ 72.

In April 2020, because of the COVID-19 pandemic, Kurtanidze "was unable to go to any physical therapy appointments because no in-person appointments were available due to lockdown," and again requested an accommodation "of pacing his work and taking short breaks throughout the day to manage the numbness and pain." *Id.* ¶ 74. Neither approved the accommodation. *See id.* ¶¶ 74–75.

In February 2021, Kurtanidze again requested an accommodation—this time, due to torn ligaments in his right wrist—"of pacing his work and taking breaks throughout the day." *Id.* ¶ 77. Again, Yoshida told Kurtanidze that his "participation was necessary for work and that his 'issues' were a 'deficiency' for [Mizuho]." *Id.*

In March 2021, after Kurtanidze's family members contracted COVID-19, Yoshida "demanded evidence in the form of a positive test result" to allow Kurtanidze to work from home. *Id.* ¶ 81. Kurtanidze told him that he was unable to get tested, given his location in New Jersey. *See id.* Yoshida allegedly "continued to insist that [Kurtanidze] produce a positive

COVID test result or return to work." *Id.* Around this time, while Kurtanidze was "struggling to recover from COVID and still dealing with his injured wrist," Kurtanidze asked "for the accommodation of conducting less important meetings by email so he could think through his responses more carefully." *Id.* ¶ 85. As a result, "Yoshida stopped inviting [Kurtanidze] to meetings relating to his job, omitted him from group emails, and removed most of Plaintiff's work assignments." *Id.*

### 3. Termination of Kurtanidze's Employment

On April 6, 2021, manager Bill Gavaris informed Kurtanidze that his employment had been terminated. *Id.* ¶ 87. Gavaris told him "that the team was 'exploring a different direction,'" and that Kurtanidze "did not fit into their vision." *Id.* Gavaris told Kurtanidze that "the termination was not based on his performance." *Id.*

The FAC alleges "[u]pon information and belief" that Kurtanidze "was fired because [Mizuho] considered its non-Japanese employees to be second-class employees, because of: (i) [Kurtanidze's] familial and caregiver statuses; (ii) [Kurtanidze] had the audacity to pursue his right to FMLA leave; (iii) [Kurtanidze] suffered from a disability." *Id.* ¶ 88.

### B. Procedural History

On August 8, 2023, Kurtanidze brought his action in state court, naming Mizuho and three managers as defendants. Dkt. 1 ("Notice of Removal") ¶ 1. On October 4, 2023, defendants removed this case to this Court on the basis of federal-question jurisdiction (and supplemental jurisdiction) and diversity jurisdiction. *Id.* ¶¶ 10–21. On October 20, 2023, defendants moved to dismiss, Dkt. 9, and filed a memorandum of law in support, Dkt. 15. On October 23, 2023, the Court ordered Kurtanidze to either amend the Complaint or oppose the motion to dismiss by November 10, 2023, Dkt. 16, a deadline later extended to December 11,

2023, Dkt. 19.  On December 11, 2023, Kurtanidze dismissed the individual defendants, Dkt. 21,

and filed the FAC, Dkt. 23.  On December 27, 2023, Mizuho—the sole remaining defendant—

moved to partially dismiss the FAC, Dkt. 24, and filed a memorandum of law in support, Dkt. 25

("Def. Br.").  On January 24, 2024, Kurtanidze opposed the motion.  Dkt. 28 ("Pl. Br.").  On

February 7, 2024, Mizuho filed a reply.  Dkt. 29 ("Def. Reply Br.").[2]

## II.      Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief. *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court

must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the

plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however,

does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels

and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555.

---

[2] Kurtanidze does not oppose the dismissal of his claims (1) as to familial status discrimination
and retaliation under the NYSHRL and NYCHRL and (2) under the NYLL.  Pl. Br. at 3 n.3.  The
Court thus grants Mizuho's motion to dismiss those claims. *See Jackson v. Fed. Exp.*, 766 F.3d
189, 198 (2d Cir. 2014).

III.   **Discussion**

    A.   **Claims Based on Race and National Origin**

        1.   **Section 1981 Race Discrimination**

A disparate treatment claim under Section 1981 is analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). To do so, the plaintiff must show that "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138). The burden of establishing a *prima facie* case in an employment discrimination case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

For purposes of this motion, Miuzho contests only the latter two elements of Kurtanidze's *prima facie* case. First, it disputes whether some events about which Kurtanidze complains qualify as "adverse employment actions." Second, it argues Kurtanidze has failed to allege factual circumstances that give rise to an inference of discriminatory intent.

        *a.     Adverse employment actions*

For a discrimination claim under Section 1981, an adverse employment action is "a 'materially adverse change' in the terms and conditions of employment." *Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted). "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or

11

an alteration of job responsibilities.'" *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). Kurtanidze alleges that he experienced six adverse employment actions. First, he was denied various promotion opportunities. FAC ¶¶ 19–22, 40–42. Second, he was denied the opportunity to transfer to a different group in September 2019. *Id.* ¶¶ 43–48. Third, his role was marginalized insofar as he was assigned "administrative tasks" rather than "important project-based assignments." *Id.* ¶ 39; *see also id.* ¶ 59. Fourth, he was "blamed" for his coworkers' mistakes. *Id.* ¶¶ 57, 66. Fifth, he was excluded from important meetings. *Id.* ¶¶ 21, 37. Six, his employment was terminated. *Id.* ¶ 87. The Court considers each in turn.

As to the first, it is well settled that the denial of a promotion qualifies as an adverse employment action. *See Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003). But to state a claim, a plaintiff must plead with some specificity the position (or positions) he sought to fill. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (to survive motion to dismiss, plaintiff must plead "that she or he applied for a *specific* position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion" or transfer (emphasis added)); *see also Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) ("[a] specific application is required" to plead a claim based on failure to promote and noting that "[this] requirement ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, [or] the plaintiff's willingness to serve in them"). Here, the FAC does not allege what positions Kurtanidze applied for—or that he ever *applied* for a particular position. It does not allege that "the vacancy at issue was not posted," *Petrosino*, 385 F.3d at 227, or that there was any other impediment to his assuming the particular role. At most, the FAC generally avers that "there was no opportunity for [Kurtanidze] . . . to

apply for" promotions "because . . . he was white." FAC ¶ 20. Such conclusory allegations do not supply sufficient factual detail as to the promotion(s) Kurtanidze was supposedly denied to survive a motion to dismiss. *See, e.g.*, *Tulino v. City of New York*, No. 15 Civ. 7106 (JMF), 2016 WL 2967847, at *6 (S.D.N.Y. May 19, 2016) (insufficient to plead that plaintiff "expressed a general interest in promotion"); *Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (insufficient to generally plead "that [the plaintiffs] were ineligible to apply for promotions"); *Billups v. Dent Wizard Int'l Corp.*, No. 05 Civ. 9356 (DAB), 2010 WL 2541361, at *8 (S.D.N.Y. June 14, 2010) (insufficient to plead that plaintiff "orally expressed to unidentified individuals . . . on a number of occasions a general interest in becoming a manager"). As such, Kurtanidze cannot base his Section 1981 case on the allegation that Mizuho failed to promote him.

As to Mizuho's denial of his September 2019 request to transfer, the denial of such a request "does not generally constitute an adverse employment action." *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 504 (S.D.N.Y. 2013). It is only when a plus-factor is present—such as an increase in salary or change in workplace responsibilities— that the denial of a transfer request constitutes an adverse employment action. *See Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002). As the Second Circuit has explained, "if a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (cleaned up) (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532–33 n.6 (10th Cir. 1998)). Here, the FAC is devoid of factual detail as to Kurtanidze's transfer application, beyond the fact that he

"applied for an opening within a different group." FAC ¶ 44. Absent allegations about that position's pay, its responsibilities, or potential for career advancement, the denial cannot be the basis for a Section 1981 claim. *See, e.g.*, *Guzman v. City of New York*, 93 F. Supp. 3d 248, 258 (S.D.N.Y. 2015) (no adverse employment action where plaintiff alleged position was "better" without elaboration); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 214 (E.D.N.Y. 2014) (no adverse employment action where impact on the plaintiff's job was "speculative"); *Pimentel v. City of New York*, No. 00 Civ. 326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) (no adverse employment action where transfer "did not involve an upgrade in position or increase in wages"). As such, Kurtanidze cannot base his Section 1981 case on the allegation that Mizuho denied his September 2019 request to transfer to a new position within the company.

As to Kurtanidze's claim that he was assigned menial work, "delegation of secretarial tasks below or outside an employee's job description" can constitute an adverse employment action. *Bowen-Hooks*, 13 F. Supp. 3d at 214. The FAC, however, does not plead that the "administrative tasks" Kurtanidze was assigned—such as "organizing issue trackers and scheduling meetings"—fell outside his job description. FAC ¶ 39. That Kurtanidze viewed these tasks as "less important" does not remove these assignments from "the sort of 'mere inconvenience or an alteration of job responsibilities' that fall short of an adverse action," particularly given Kurtanidze's concession "that [his] pay and hours remained the same." *Jeffrey v. Montefiore Med. Ctr.*, No. 11 Civ. 6400 (RA), 2013 WL 5434635, at *19 (S.D.N.Y. Sept. 27, 2013); *see also, e.g.*, *Bowen-Hooks*, 13 F. Supp. 3d at 214 (no adverse employment action where plaintiff did not allege she had been "asked to perform tasks that were outside of her job description"); *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) ("Where assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or

14

work assignments does not, without more, rise to the level of an adverse employment action.").
Kurtanidze thus cannot base his Section 1981 case on his being assigned undesirable work.

The fourth and fifth theories—that Kurtanidze was "blamed" for his coworkers' mistakes,
FAC ¶ 57, and excluded from important meetings, *id.* ¶¶ 21, 37—also fail. "Everyday workplace
grievances, disappointments, and setbacks do not constitute adverse employment actions within
the meaning of Title VII." *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 211 (2d
Cir. 2010) (summary order). Although it may be unpleasant to be accused of contributing to a
project's failure—or to be excluded from a meeting—neither constitutes "a materially significant
disadvantage with respect to the terms of [Kurtanidze's] employment." *Williams*, 368 F.3d at
128; *see also, e.g.*, *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019) ("[h]arsh
reprimands" do not constitute an adverse employment action "where there is no tangible effect
on employment"); *Littlejohn*, 795 F.3d at 312 n.10 (being "excluded from meetings" does not
constitute an adverse employment action).

Finally, all agree Kurtanidze's termination qualifies as an adverse employment action.
Def. Br. at 4–5. The termination is thus the only viable adverse employment action pled in the
FAC. For his Section 1981 claim to survive the motion to dismiss, it must plausibly plead that
his termination "occurred under circumstances giving rise to an inference of discriminatory
intent." *Brown*, 673 F.3d at 150 (citation omitted).

With the claim thus narrowed, the Court turns to the element of discriminatory intent.

### b.    *Inference of discriminatory intent*

The parties' dispute on this point centers on whether the FAC has alleged sufficient facts
to infer discrimination based on *race*, as opposed to on *national origin*. The distinction matters
because, in *Saint Francis College v. Al–Khazraji*, 481 U.S. 604 (1987), the Supreme Court held

that a Section 1981 claim may not be based "solely on . . . place or nation of . . . origin." *Id.* at

613; *see also, e.g.*, *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("It is settled that

Section 1981 does not prohibit discrimination on the basis of . . . national origin."). Mizuho

argues that Kurtanidze's claims do not focus on his *race*, but on the fact that he is *not from*

*Japan.* Def. Br. at 6–8. Mizuho argues that the FAC does not allege that Kurtanidze "was told

to act more like an *Asian* employee," but instead that he was "told to act 'more like a Japanese

employee.'" *Id.* (emphasis in original) (quoting FAC ¶ 36). Because the FAC thus lacks

"sufficient factual allegations that similarly situated *Asian* employees were given more favorable

treatment than employees not in the protected group," Mizuho argues, its Section 1981

discrimination claim must be dismissed. *Id.* (emphasis in original).

     This argument is easily put down. The FAC clearly pleads that Mizuho discriminated—

against Kurtanidze and others—based on whether an employee was Japanese or not. Under the

case law, discrimination on that basis can qualify as racial discrimination. *See, e.g.*,

*Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756–57 (7th Cir. 2006) (rejecting argument that

Section 1981 claim based on "Iranian ancestry" is impermissibly based on national origin); *Sinai*

*v. New England Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993) (same as to claim based on

plaintiff's "Israeli background"); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987)

(same as to claim based on plaintiff's "Puerto Rican descent"). In *Saint Francis College* itself,

the Supreme Court emphasized that Section 1981 bars discrimination based on "ethnic

characteristics," 481 U.S. at 613, and offered as examples the distinctions drawn in the

congressional debates between those who are "Scandinavian," "Jew[ish]," "Italian," "Russian,"

and "German," *id.* at 612; *see also, e.g.*, *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir.

1991) (Section 1981 "protect[s] against discrimination on the basis not only of race, but also of ancestry or ethnic characteristics" (internal quotation marks omitted)).

*Saint Francis College*'s holding that Section 1981 does not permit claims based on national origin excludes a different set of claims: those based solely on one's *place of birth*. For that reason, the Court held that the plaintiff could state a claim "on remand [if he] can prove that he was subjected to intentional discrimination based on the fact that he was born *an Arab*, rather than solely on" the fact that he was born *in Iraq*. 481 U.S. at 613 (emphasis added). As Justice Brennan's concurrence explained:

> [T]he line between discrimination based on "ancestry or ethnic characteristics," and discrimination based on "place or nation of . . . origin," is not a bright one. It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country where a person was *born*, or, more broadly, the country from which his or her ancestors *came*. Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group.

*Id.* at 614 (Brennan, J., concurring) (emphasis in original) (internal citations and quotation marks omitted). As such, "claims based on race and national origin 'may substantially overlap or even be indistinguishable depending on the specific facts of a case,'" *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003)), and often "the same evidence can underlie both a race-based Section 1981 claim and a national-origin-based Title VII claim," *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162–63 (4th Cir. 2018).

Mizuho ignores this nuance. Seizing on the capacity of the word "Japanese" to refer either to the nationality (*i.e.*, those who hold Japanese citizenship) or to the ethnic group (*i.e.*, those who trace their common cultural background to the Yamato people), *see generally* Jane H. Yamashiro, *The Social Construction of Race and Minorities in Japan*, 7 SOCIO. COMPASS 147

(2013), Mizuho self-servingly paints the FAC as necessarily referring only to the former insofar as it alleges, for example, that Mizuho's managers made statements about the superiority of "Japanese employees," FAC ¶ 35.  But the FAC does not embrace this narrow characterization. And on a motion to dismiss, upon which the Court must draw all reasonable inferences in favor of non-movant Kurtanidze, *see Koch*, 699 F.3d at 145, these comments must be construed to refer, at least in part, to ethnicity, and not exclusively nationality.[3]  *Cf. Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018) ("Perhaps this is an inference that a factfinder might ultimately make, but at this stage we must draw all inferences in favor of the plaintiffs, not the defendants.").

The FAC thus pleads discrimination based on Kurtanidze's non-Japanese ethnicity.[4]  At the pleading stage, Kurtanidze need not marshal "substantial evidence of discriminatory intent," *Littlejohn*, 795 F.3d at 311; his burden is merely "*de minimis*," *Abdu-Brisson v. Delta Air Lines*,

---

[3] Mizuho argues that "[Kurtanidze's] original Complaint" "asserted only 'national origin'" claims under Section 1981 and "made absolutely no allegations whatsoever that any of the alleged adverse actions were caused by discriminatory animus on the basis of race." Def. Br. at 1, 8.  But although "allegations in an amended pleading [that] directly contradict pleadings in the original complaint" can be "disregarded," *Wheeler v. Slanovec*, No. 16 Civ. 9065 (KMK), 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019), there is no contradiction here.  The original Complaint did not plead that the alleged comments were based on national origin to the exclusion of race.  And claims based on national origin are often "indistinguishable" from those based on race, and vice versa. *Vill. of Freeport*, 814 F.3d at 606.  Absent a contradiction, the Court has no warrant to depart from the baseline principle that the filing of an amended complaint "supersedes the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998).

[4] Indeed, in its opening brief, Mizuho did not argue to the contrary.  It contended there that the FAC's allegations did not support Kurtanidze's "contention that Mizuho favored Asians." Def. Br. at 7.  Only in its reply did Mizuho argue that the FAC does not support an inference of racially discriminatory intent. Def. Reply Br. at 4–6.  "[A]rguments may not be made for the first time in a reply brief." *Simpson v. City of New York*, 793 F.3d 259, 264 (2d Cir. 2015) (citation omitted).  The Court has nonetheless considered, and rejected, Mizuho's belated argument.

*Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). "An inference of discrimination can arise from circumstances including . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms." *Littlejohn*, 795 F.3d at 312. The comments by Mizuho managers that the FAC alleges, including that Kurtanidze should be "more like a Japanese employee," FAC ¶ 36, and that (unlike Kurtanidze) "Japanese employees prioritize work," *id.* ¶ 35, qualify as ethnically degrading. The acquiescence of Mizuho managers to a Japanese coworker's refusal "to listen to [Kurtanidze's] instructions because of [his] ethnicity," *id.* ¶ 57, reinforces the inference. *See, e.g.*, *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) ("co-worker harassment" may be attributable to employer where it goes "unchecked" despite complaints); *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 271 (E.D.N.Y. 2019) (recognizing same as to "denial of [plaintiff's] application for a promotion").

The Court thus denies Mizuho's motion to dismiss the Section 1981 discrimination claim, while narrowing its scope to Kurtanidze's termination.

### 2.    Section 1981 Retaliation

A retaliation claim under Section 1981 is also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). The plaintiff bears the initial burden to establish a *prima facie* case of retaliation. To do so, the plaintiff must show that (1) he "participat[ed] in a protected activity"; (2) "the defendant knew of the protected activity"; (3) he faced "an adverse employment action"; and (4) "a causal connection" exists "between the protected activity and the adverse employment action." *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). As with discrimination claims, this burden is "*de minimis.*" *Id.* (quoting *Jute*, 420 F.3d at 173).

Mizuho argues that the FAC does not plead that Kurtanidze engaged in a protected activity. An employee's complaint qualifies as a protected activity if "the employee ha[d] a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001). Mizuho contends that the one protected activity alleged in the FAC—"protesting the exclusion of non-Japanese speaking employees from business discussions" conducted in Japanese, FAC ¶ 99—does not qualify as such, given that Mizuho's decision not to bar the use of Japanese in the workplace does not discriminate on the basis of race. Def. Br. at 8–9. Kurtanidze responds that "[t]he Japanese language is characteristic of the Japanese ethnicity," and allowing Mizuho employees to speak Japanese "effectively exclude[d] from the discussion non-Japanese employees." Pl. Br. at 10.

On this point, Mizuho is correct. *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983) is instructive. There, the Second Circuit affirmed the dismissal of a race discrimination claim based on a governmental entity's refusal to translate forms into Spanish. *See id.* at 37–38. Such a policy, the Circuit held, "does not on its face make any classification with respect to Hispanics as an ethnic group." *Id.* at 41. "A classification is implicitly made, but it is made on the basis of language, *i.e.,* English-speaking versus non-English-speaking individuals, and not on the basis of race, religion or national origin." *Id.* The same is so here. That some employees decided to speak Japanese with one another in the workplace, FAC ¶ 21, implies a classification—but not an ethnic or racial one. It classifies based on whether a person knows Japanese.[5] "[L]anguage is

---

[5] Because Section 1981 requires discriminatory *intent*, not mere disparate *impact*, *see Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000), that employees not from Japan were less likely to understand their colleagues' Japanese language discussions does not suffice to state a claim. *Cf., e.g., Liu v. Indium Corp. of Am.*, No. 20-64, 2021 WL 3822871, at *1 (2d Cir. Aug. 27, 2021) (summary order) (no *prima facie* case of discrimination as to defendant's "no Chinese rule" where plaintiff failed to plead that "employees were permitted to speak other foreign languages at work or that Chinese employees were otherwise singled out under the rule").

not an immutable characteristic." *Gutierrez v. Mun. Ct.*, 861 F.2d 1187, 1188–89 (9th Cir. 1988). Kurtanidze could have chosen to learn Japanese. Much as Mizuho was not required to allow its employees to speak in their native tongue, *see Joseph v. N. Shore Univ. Hosp.*, 473 F. App'x 34, 37 (2d Cir. 2012), it was not required to force employees to use a particular language. Kurtanidze does not cite contrary authority. Because no reasonable observer could conclude that the alleged corporate conduct—condoning coworkers' use of Japanese language—violated antidiscrimination law, the FAC does not plausibly allege a retaliation claim under Section 1981. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) ("A plaintiff's belief . . . is not reasonable simply because he or she complains of something that appears to be discrimination in some form."); *see also Leroy v. Delta Air Lines*, No. 21 Civ. 267, 2022 WL 12144507, at *5 (2d Cir. Oct. 27, 2022). The Court thus dismisses Kurtanidze's Section 1981 retaliation claim.

### 3.    NYSHRL and NYCHRL Discrimination and Retaliation

The FAC's discrimination and retaliation claims under the NYSHRL and NYCHRL are also analyzed under the same burden-shifting framework. *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361–62 (S.D.N.Y. 2012). However, because the NYCHRL operates as a "one-way ratchet" with "uniquely broad and remedial purposes," claims under the NYCHRL "must be reviewed independently from and 'more liberally' than" their federal law counterparts. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). Mizuho moves to dismiss these claims as (1) time-barred and (2) for failure to state a claim. The Court considers each objection in turn.

    *a.*    *Statute of limitations*

Mizuho argues that Kurtanidze's state and city law claims are time barred.  Claims under

both statutes are subject to a three-year limitations period.  *See* N.Y. C.P.L.R. § 214(2)

(NYSHRL); N.Y.C. Admin. Code § 8-502(d) (NYCHRL); *see also Kassner v. 2nd Ave.*

*Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) ("[C]laims under the NYSHRL and the

NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts.").

Mizuho makes two arguments.  First, it argues, because Kurtanidze filed this action on

August 8, 2023, he may not rely on pre-August 8, 2020 conduct as evidence of discrimination

"on the basis of race and/or national origin," including for his termination claim, which accrued

in April 2021.  Def. Br. at 11–13.  That is wrong.  As the Supreme Court has explained, the time

bar for discrete acts does not "bar an employee from using the prior acts as background evidence

in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002);

*see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) ("[R]elevant

background evidence . . . may be considered to assess liability on the timely alleged act.").  The

same is true under the NYSHRL and NYCHRL.  *See, e.g., Kellman v. Metro. Transp. Auth.*, 8 F.

Supp. 3d 351, 370 (S.D.N.Y. 2014) (citing *Anderson v. Nassau County Dep't of Corr.*, 558 F.

Supp. 2d 283, 299 (E.D.N.Y. 2008)); *St. Jean Jeudy v. City of New York*, 37 N.Y.S.3d 498, 500

(1st Dep't 2016)).  As such, in pleading Mizuho's discriminatory intent, Kurtanidze is not

required to rely exclusively on conduct or statements within three years of his filing suit.

Second, Mizuho argues that Kurtanidze may not recover for discrete adverse actions

taken before August 8, 2020.  Def. Br. at 11–13.  That argument may ultimately prevail, but not

at this time.  Kurtanidze invokes the continuing violation doctrine as his basis to pursue liability

based on pre-August 8, 2020 claims.  Pl. Br. at 11–12.  Under the NYCHRL, that doctrine allows

a plaintiff to recover for "[o]therwise time-barred" discrete discriminatory acts if those acts form part of "a continuous practice or policy of discrimination." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302, 307 (S.D.N.Y. 2016) (cleaned up). In response, Mizuho errantly relies on the more demanding federal standard, which saves only "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment," *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015). That standard does not apply to NYCHRL claims. Because Mizuho has not argued that the FAC's pleadings prohibit application of the continuing violation theory to the NYCHRL claims under the applicable legal standard, the Court rejects his motion to narrow those claims to prohibit recovery for pre-August 8, 2020 acts. *See Jackson*, 766 F.3d at 198.

That leaves the FAC's claims under the NYSHRL, a point neither party briefed. Before its amendment in August 2019, courts held that the NYSHRL tracked federal anti-discrimination law, including as to the scope of the continuing violation doctrine. *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013); *see also Taylor*, 207 F. Supp. 3d at 302; *Kazolias v. IBEWLU 363*, 806 F.3d 45, 53 (2d Cir. 2015) (applying federal standard to claims brought under NYSHRL). No court has addressed the impact of the NYSHRL's 2019 amendment on the standard for continuing violations. That amendment directs courts to construe the NYSHRL, like the NYCHRL, "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed." N.Y. Exec. Law § 300. That language, in the NYCHRL, has served as a basis for the holding that the NYCHRL's "uniquely remedial provisions" required a more liberal continuing violation doctrine. *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 35 (1st

Dep't 2009).  The briefs in this case do not identify, let alone engage, with whether the NYSHRL, as amended, sets a standard coextensive with the NYCHRL's, or a standard between federal and city law.  *See Wheeler v. Praxair Surface Techs., Inc.*, No. 21 Civ. 1165 (PAE), 2023 WL 6282903, at *10–11  (S.D.N.Y. Sept. 26, 2023).  Absent guidance from the parties, the Court will not reach this issue on the pleadings.  *Cf., e.g., Cline v. 1-888-PLUMBING Grp., Inc.*, 146 F. Supp. 2d 351, 363 n.4 (S.D.N.Y. 2001) (declining to reach inadequately briefed issue).  For present purposes, the Court assumes that the amended NYSHRL tracks the NYCHRL as to the continuing violation doctrine, without prejudice to Mizuho's right later to argue that the NYSHRL sets a higher standard.

The Court thus denies Mizuho's motion to dismiss as time barred Kurtanidze's NYSHRL and NYCHRL discrimination claims based on race and national origin.[6]

### b. *Failure to state a claim*

Because the FAC's Section 1981 discrimination claim survives, its parallel claims for discrimination under state and city law—which treat federal law as a "floor," *Loeffler*, 582 F.3d at 278—necessarily also survive.  Indeed, given the lesser liability standard under city law— which requires only "differential treatment," rather than a materially adverse employment action—a plaintiff can prevail under the NYCHRL while losing under federal law.  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

---

[6] Mizuho also moves to dismiss as time barred Kurtanidze's other claims under the NYSHRL and NYCHRL: his discrimination and retaliation claims based on (1) disability; (2) caregiver status; and (3) gender. Def. Br. at 20–21. It makes the same arguments reviewed above with respect to Kurtanidze's race and national origin claims. These claims rise and fall together, as the parties recognize. *See, e.g., id.* at 20. The Court thus denies the motion to dismiss these other claims under the NYSHRL and NYCHRL.

The FAC's retaliation claims under the NYSHRL and NYCHRL, however, do not state a claim. Claims under city law must be "reviewed independently from and 'more liberally' than their federal and state counterparts," *Loeffler*, 582 F.3d at 278, but the only difference between federal and city law with respect to retaliation claims is that city law "is slightly more solicitous" in that a plaintiff need not show an "adverse employment action," but only "that something happened that was 'reasonably likely to deter a person from engaging in protected activity.'" *Rozenfeld v. Dep't of Design & Constr.*, 875 F. Supp. 2d 189, 208 (E.D.N.Y. 2012) (citation omitted); *see also Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (describing federal and city tests as otherwise "identical"). City law thus retains the requirement from Section 1981 that the plaintiff have engaged in protected activity. *See* N.Y.C. Admin. Code § 8–107(7); *see also Rozenfeld*; 875 F. Supp. 2d at 208; *Malena*, 886 F. Supp. 2d at 361–62. As explained above in connection with the dismissal of the retaliation claim under Section 1981, the FAC does not so plead, as it does not plead that Kurtanidze had an objectively reasonable belief that the conduct about which he complained—Mizuho's condoning coworkers' use of Japanese—violated antidiscrimination law. *See Kelly*, 716 F.3d at 15; *Leroy*, 2022 WL 12144507, at *5. It thus does not state a retaliation claim under the NYSHRL or NYCHRL, either.

The Court thus grants the motion to dismiss the FAC's NYSHRL and NYCHRL retaliation claims based on race and national origin, but denies the motion to dismiss its discrimination claims based on race and national origin.

**B.      Claims Based on Caregiver Status and Associated Leave and Leave Requests**

**1.      FMLA Claims**

The FAC asserts various claims based on Kurtanidze's caregiver status and his associated leave requests. The first set of such claims arises under the FMLA. Under the FMLA, "an eligible employee" is entitled to "a total of 12 workweeks of leave during any 12-month period" for designated reasons, including "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1). The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the statute. *Id.* § 2615(a)(1). "The Second Circuit has recognized two types of FMLA claims—'interference' claims and 'retaliation' claims." *Smith v. Westchester City*, 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011) (citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam)). The FAC asserts both, and Mizuho moves to dismiss both.[7] The Court considers each in turn.

*a.      FMLA Interference*

To establish a claim of FMLA interference, a plaintiff must establish that: (1) he is "an eligible employee under the FMLA"; (2) "the defendant is an employer as defined by the FMLA"; (3) he "was entitled to take leave under the FMLA"; (4) he "gave notice to the defendant of [his] intention to take leave"; and (5) he "was denied benefits to which [he] was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

---

[7] The FAC also appears to assert a claim for "[d]iscrimination . . . in violation of the FMLA." FAC ¶¶ 140–45. As Mizuho argues, and Kurtanidze appears to concede, the FMLA does not provides for such a cause of action. *See* Def. Br. at 17–18. There are two available "types of claims under the FMLA—and only two types of claims—interference and retaliation." *Arnold v. Rsch. Found. for State Univ. of N.Y.*, 216 F. Supp. 3d 275, 285 (E.D.N.Y. 2016). To the extent the FAC means to assert a claim for FMLA discrimination, the Court dismisses that claim.

On this motion, Mizuho does not dispute that the FAC adequately pleads each element with respect to each occasion in which it allegedly denied leave to Kurtanidze.  It argues that all of the FAC's interference claims are time-barred.  Def. Br. at 19–20.

Most indeed are time-barred—but not all.  "FMLA claims are generally subject to a two-year statute of limitations, but that limitations period extends to three years when the violation is 'willful.'"  *Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 53 (2d Cir. 2017) (summary order) (quoting *Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (per curiam)); *see also* 9 U.S.C. §§ 2617(c)(1)–(2).  For purposes of this motion, Mizuho concedes that the three-year limitations period applies to the FAC's claims.  Def. Br. at 18.  Because an FMLA claim for interference accrues once the "the last event constituting the alleged violation" occurs—that is, once an employer denies a request for leave—the FAC may challenge only denials of leave on or after August 8, 2020.  9 U.S.C. § 2617(c)(1); *see also Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014).

As Mizuho rightly notes, that precludes some of the FAC's allegations.  It alleges, for instance, that Kurtanidze requested FMLA leave in June 2019, which Mizuho allegedly granted only in part, FAC ¶ 31, did so again "[i]n or around" December 2019, which Mizuho allegedly ignored, *id.* ¶¶ 60, 62, and did so once again in January or February 2020, which Mizuho also allegedly ignored, *id.* ¶¶ 71–72; *see also id.* ¶ 73.  The FAC does not allege that Kurtanidze only became aware in August 2020 of Mizuho's constructive denial of these leave requests.  *Cf. Murphy v. District of Columbia*, 390 F. Supp. 3d 59, 67 (D.D.C. 2019) (noting that 29 C.F.R. § 825.300(b)(1) generally requires an employer to notify an employee of his eligibility to take FMLA leave within five business days).  On the contrary, it alleges that, in response to the leave request, Kurtanidze's manager deliberately "assigned him more trivial work especially towards

the end of the day to force [him] to work late." FAC ¶ 72.  The FAC thus does not plead facts to

sustain these claims as accruing on or after August 8, 2020.  They are time barred.

The FAC, however, includes one claim that cannot be rejected on the pleadings as time-

barred.  It alleges that in February 2021, Kurtanidze requested the "reasonable accommodation

of . . . taking breaks throughout the day" to manage the "excruciating pain" he felt in his right

wrist.  FAC ¶ 77.  To be sure, the FAC does not term this a request for "FMLA leave," in

contrast to Kurtanidze's other requests.  *Cf. id.* ¶¶ 31, 60–62, 71–73.  But "[c]ase law and federal

regulations make it clear . . . that employees do not need to invoke the FMLA in order to benefit

from its protections."  *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009); *see also*

*Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) ("In providing notice,

the employee need not use any magic words.").  "The critical question is whether the information

imparted to the employer is sufficient to reasonably apprise it of the employee's request to take

time off for a serious health condition."  *Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F.

Supp. 2d 423, 427 (S.D.N.Y. 2007) (citation omitted).  And Mizuho does not argue that the fact

that Kurtanidze requested "breaks"—as opposed to "leave"—is of consequence.  The Court thus

cannot dismiss as time-barred the FAC's FMLA interference claim based on the February 2021

request.  The Court sustains that claim, while otherwise dismissing the FAC's FMLA

interference claims.[8]

---

[8] Separately, Kurtanidze appears to argue the FAC articulates a different ground for FMLA
interference liability, based on the fact that he "continued wearing wrist splints at work through
to the termination of his employment"; this, he argues, "effectively put Defendant Mizuho on
notice that he continued to need a medical leave of absence to treat his chronic condition," and
that through 2021 he was at all times being constructively denied leave.  Pl. Br. at 19.  Without
more, these facts could not sustain liability, as an employee must give sufficient information to
the employer "to provide reasonable notice that the employee requests time off for a serious
health condition."  *Slaughter v. Am. Bldg. Maint. Co.*, 64 F. Supp. 2d 319, 325 (S.D.N.Y. 1999).
"Merely calling in sick . . . is insufficient to put a company on notice that an employee is

> b.    *FMLA Retaliation*

To establish a *prima facie* case of FMLA retaliation, a plaintiff must establish that: (1) "he exercised rights protected under the FMLA"; (2) "he was qualified for his position"; (3) "he suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Retaliation claims are subject to the same two-year statute of limitations (extended to three years for willful violations) as interference claims. *See Porter*, 392 F.3d at 531.

Mizuho first argues any allegedly retaliatory action taken before August 8, 2020 is time-barred. Def. Br. at 18–19. Mizuho is correct. An FMLA retaliation claim accrues when the employer takes the allegedly adverse action. *See Matias v. Montefiore Med. Ctr.*, No. 20 Civ. 2849 (VEC), 2022 WL 4448585, at *16 (S.D.N.Y. Sept. 23, 2022). For a retaliation claim to be timely in this case, the adverse action must therefore have occurred on or after August 8, 2020. *See Morgan*, 536 U.S. at 110 (holding that a "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened,'" even if the act continued to have effects after that point). The only alleged adverse actions pled in the FAC that survive are therefore manager Yoshida's "curtailment" of Kurtanidze's work assignments between March and April 2021, FAC ¶ 85, and Kurtanidze's termination in April 2021, *id.* ¶ 87.[9]

---

requesting leave that may be eligible under the FMLA." *Brown v. The Pension Boards,* 488 F. Supp. 2d 395, 409 (S.D.N.Y. 2007). The same applies to being sick (or wearing splints) *at work*. *Cf.* 29 C.F.R. § 825.302(c) (an employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave").

[9] For an FMLA retaliation claim, an adverse employment action is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising h[er] legal rights." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). This is broader than the standard applied above in connection with the Section 1981 discrimination claim—

Mizuho next argues that the FAC fails to plead the first element of the *prima facie* case—that Kurtanidze exercised rights protected under the FMLA.  It argues that, because the FAC pleads that Kurtanidze "was *denied* his rights under the FMLA," and thus could not take unpaid leave, it cannot plead that Mizuho retaliated against him for "exercis[ing] rights protected under the FMLA."  Def. Br. at 18 (emphasis in original).  That argument fails.  To establish liability, a plaintiff need not prove that his employer retaliated against him because he *took* FMLA leave.  "The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised *or attempted to exercise* FMLA rights."  *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 168 (2d Cir. 2017) (emphasis added) (quoting 29 C.F.R. § 825.220(c)).  That Mizuho allegedly denied Kurtanidze's requests for leave *and* retaliated against him for having made such requests does not foreclose an FMLA retaliation claim.  *See, e.g.*, *Roberts v. AIG Glob. Inv. Corp.*, No. 06 Civ. 5966 (GEL), 2008 WL 4444004, at *2 (S.D.N.Y. Sept. 30, 2008) (triable question as to employer's retaliatory intent where plaintiff requested but did not receive FMLA before his termination); *see also Hall v. Urb. Assembly, Inc.*, No. 19 Civ. 11572 (JMF), 2022 WL 19708, at *2 (S.D.N.Y. Jan. 3, 2022) (noting that interference and retaliation claims may "overlap[]").

Mizuho next argues that the FAC fails to plead the fourth prong of the *prima facie* case—that the adverse actions occurred under circumstances giving rise to an inference of retaliatory intent.  That argument also fails.  The FAC pleads both (1) the temporal proximity of events and

---

which requires the discriminatory conduct relate to the terms and conditions of employment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Millea*, 658 F.3d at 163–64 (discussing purpose of this "broader definition" in light of anti-retaliation statutes' focus on "preventing employers from deterring their employees from exercising their legitimate legal rights").  That the FAC does not plausibly plead an adverse employment action other than termination in connection with the Section 1981 discrimination claim does not limit the adverse actions it may claim in connection with the FMLA retaliation claim.

(2) his managers' animus as bases for this inference.  As to the former, as pled, Kurtanidze

requested leave in February 2021, to manage the "excoriating pain" he felt in his right wrist.

FAC ¶ 77.  The adverse actions at issue here took place soon after—in March and April 2021.

"Though there is no bright-line rule on temporal proximity, [the Second Circuit] has held that a

one to two month period between the protected activity and adverse employment action is

generally sufficient to make a *prima facie* causation showing."  *Rivera v. JP Morgan Chase*, 815

F. App'x 603, 608 (2d Cir. 2020) (summary order).  On a motion to dismiss, where the showing

of discriminatory intent may be met by a lesser showing than needed to make out a *prima facie*

case, the temporal inference alone sustains the claim as to this element.  *Kassner*, 496 F.3d at

238.  That inference is bolstered by the allegation that Kurtanidze's managers told him he had

"abandon[ed] the team" by taking leave, FAC ¶ 64, "that his 'issues' were a 'deficiency' for"

Mizuho, *id.* ¶ 77, and that if Kurtanidze continued to take leave, "his job would be at risk," *id.*

¶ 82.  Such comments are direct "evidence of retaliatory animus."  *Cobb v. Pozzi*, 363 F.3d 89,

108 (2d Cir. 2004); *see also, e.g., Peterson v. Long Island R.R. Co.*, No. 10 Civ. 480 (ILG), 2010

WL 2671717, at *4 (E.D.N.Y. June 30, 2010) ("degrading comments" regarding plaintiff's leave

sufficient to establish circumstances giving rise to inference of retaliatory intent).

　　　The Court thus dismisses the FMLA retaliation claims as to adverse employment actions

taken before August 8, 2020, but denies them as to actions thereafter.[10]

### 2.　　NYSHRL and NYCHRL Discrimination Claims

　　　The FAC also asserts claims based on caregiver status and gender under the NYSHRL

and NYCHRL.  These claims are analyzed under the same burden-shifting framework used

---

[10] For the same reasons, the Court denies Mizuho's motion to dismiss the FAC's parallel claims under the NYSHRL and NYCHRL of retaliation based on caregiver status.  Def. Br. at 14–15, 17–20.

above. *See Malena*, 886 F. Supp. 2d at 361–62.  To establish a *prima facie* case, a plaintiff must

show that "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3)

he suffered an adverse employment action; and (4) the adverse employment action occurred

under circumstances giving rise to an inference of discriminatory intent."  *Brown*, 673 F.3d at

150 (quoting *Holcomb*, 521 F.3d at 138).  Notwithstanding the NYCHRL's "uniquely broad and

remedial purposes," *Loeffler*, 582 F.3d at 278, a plaintiff must still adduce evidence supporting

an inference of discrimination to survive a motion to dismiss, *see Williams v. Regus Mgmt. Grp.,

LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011).

On this motion, Mizuho contests only the latter two elements of the *prima facie* case.

First, Mizuho argues that the FAC fails to plausibly plead adverse employment actions other than

Kurtanidze's termination.  Def. Br. at 15.  That is wrong.  "[T]o make out the [adverse action]

prong of a *prima facie* case of discrimination under the NYCHRL, a plaintiff must simply show

that [he] was treated differently from others in a way that was more than trivial, insubstantial, or

petty." *Williams*, 836 F. Supp. 2d at 173.  The case law has yet to resolve whether the same is

true under the amended NYSHRL, *see Wheeler*, 2023 WL 6282903, at *10–11; as Mizuho does

not address this standard, the Court assumes that such is so.  The FAC clears this bar in that—

even putting aside the termination—it alleges that Kurtanidze's family leave was denied, FAC

¶ 29, that he was marginalized by his manager and excluded from key projects, *id.* ¶ 86, and that

he was assigned trivial tasks, *id.* ¶¶ 39, 59.

Second, Mizuho argues that the FAC does not allege evidence giving rise to an inference

of discriminatory intent.  That argument also fails.  As with the FMLA claims, the comments by

managers criticizing Kurtanidze for "abandoning the team" to attend to his son's medical

emergency, *id.* ¶ 64, and telling him that "the primary caregiver is supposed to be the mother of

the children," as a "man . . . cannot be the primary caregiver," *id.* ¶ 29, are fairly cast as "direct" evidence of discriminatory animus. *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir. 2001). Demanding conformance with gender stereotypes is a form of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989); *see also, e.g., Zhao v. State Univ. of N.Y.*, 472 F. Supp. 2d 289, 310 (E.D.N.Y. 2007) ("[B]oth the Supreme Court and the Second Circuit have held that decisions resulting from 'stereotyped' impressions or assumptions about the characteristics or abilities of women [and men] violate Title VII."). These allegations "give plausible support to a minimal inference of discriminatory motivation," as required at this stage. *Littlejohn*, 795 F.3d at 311; *see also Mauro v. N.Y.C. Dep't of Educ.*, No. 21-2671, 2022 WL 17844438, at *1 (2d Cir. Dec. 22, 2022) (noting that the Circuit has often cautioned against the application of "overly stringent pleading standards" and against imposing "'too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage'" (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016)). "[S]tereotypical remarks about the incompatibility of [fatherhood] and employment can certainly be evidence that gender played a part in an employment decision" and "can by itself and without more be evidence of an impermissible, sex-based motive." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

The Court thus denies the motion to dismiss the FAC's NYSHRL and NYCHRL discrimination claims based on caregiver status and gender.

## C.    Claim Based on Breach of Contract

The FAC finally asserts a claim for breach of contract. FAC ¶¶ 159–63. Its allegations are sparse as to this claim. It claims that the parties "entered into a contract whereby [Kurtanidze] performed services for [Mizuho] and, in exchange, [Mizuho] paid [Kurtanidze] a

salary and benefits including paid sick days." *Id.* ¶ 160.  It further alleges that Kurtanidze

"performed under the contract, but [Mizuho] refused to let [Kurtanidze] use sick days for their

intended purpose—to care for one's self during times of illness," *id.* ¶ 161, and thus that

"[Mizuho] breached its contract with [Kurtanidze] when it refused to let him use sick days and

insisted that he work despite using a sick day," *id.* ¶ 162.

    As Mizuho argues, these meager averments do not state a claim for breach of contract.

"Stating in a conclusory manner that an agreement was breached does not sustain a claim of

breach of contract." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).  At

minimum, "a complaint must plead the specific provisions of the contract that were allegedly

breached and the specific actions of the defendants that constituted that breach." *Anderson v.

Greene*, 774 F. App'x 694, 697 (2d Cir. 2019) (summary order).  The FAC fails even to identify

the contract at issue—whether it is written or oral, when it was concluded between the parties,

and what its terms are—much less identify specific provisions that Mizuho breached.  The Court

thus grants the motion to dismiss the FAC's claim for breach of contract.

## CONCLUSION

    For the foregoing reasons, the Court grants Mizuho's motion to dismiss in part and denies

it in part.  The Court orders as follows:

- The FAC's Section 1981 discrimination claim is narrowed to the issue of
  Kurtanidze's termination.

- The FAC's Section 1981 retaliation claim is dismissed.

- The FAC's NYSHRL and NYCHRL retaliation claims based on race and national
  origin are dismissed.

- The FAC's NYSHRL and NYCHRL discrimination and retaliation claims based on familial status are dismissed.

- The FAC's NYLL claims are dismissed.

- The FAC's FMLA interference claim is narrowed to leave requests denied on or after August 8, 2020.

- The FAC's FMLA retaliation claim is narrowed to adverse employment actions taken on or after August 8, 2020.

- The FAC's breach of contract claim is dismissed.

The Court otherwise denies the motion to dismiss. Mizuho must answer the FAC by March 27, 2024.

The Clerk of Court is respectfully directed to terminate all pending motions. By separate order, the Court will schedule a date for an initial pretrial conference.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: March 13, 2024
       New York, New York