UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID KURTANIDZE,

                                        Plaintiff,

                    -v-

MIZUHO BANK, LTD. *et al.*,

                                        Defendants.

---

23 Civ. 8716 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff David Kurtanidze brings this employment discrimination suit against his former employer, Mizuho Bank, Ltd. and Mizuho Americas Services LLC (collectively, "Mizuho"). He brings claims of race discrimination under 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a) *et seq.* ("NYCHRL"); discrimination based on national origin, gender, caregiver status, and disability in violation of the NYSHRL and the NYCLRL; retaliation based on sex, caregiver status, and disability under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the NYSHRL, and NYCHRL; and interference based on disability under the FMLA.

Before the Court is Mizuho's motion for summary judgment. For the reasons that follow, the Court grants the motion in full.

## I.    Background[1]

### A.    The Parties

Kurtanidze is a white male from the country of Georgia.  JSF ¶¶ 1–2; Pl. 56.1 ¶ 288.  He is

a naturalized United States citizen and resides in New Jersey.  JSF ¶ 11; TAC ¶ 2.  Kurtanidze

writes and speaks English fluently and speaks with an Eastern European accent.  Pl. 56.1 ¶ 51.

Mizuho Bank, Ltd. ("Mizuho Bank") is a global bank whose parent entity, Mizuho

Financial Group, Inc. ("Mizuho Financial"), is headquartered and incorporated in Japan.

JSF ¶¶ 5–7, 21.  Mizuho America Services LLC ("Mizuho Americas")[2] is an entity affiliated

---

[1] The Court draws the following facts from the parties' submissions in support of and in opposition to defendants' summary-judgment motion.  These include the following: (1) the parties' joint statement of stipulated facts, Dkt. 105 ("JSF"); (2) the parties' Local Rule 56.1 statements in support of ("Def. 56.1") and opposition to ("Pl. 56.1") the summary-judgment motion, Dkts. 114, 125; (3) the declarations in support of the motion (plus attached exhibits) of Keesha Pellam, Dkt. 108, ("Pellam Decl."); Florencia Luccioni, Dkt. 109 ("Luccioni Decl."); and Edward M. Yennock, Dkt. 111 ("Yennock Decl."); the declarations in opposition to the motion (and attached exhibits) of David Kurtanidze, Dkt. 121 ("Kurtanidze Decl."), and Siobhan Klassen, Dkt. 122 ("Klassen Decl."); and (4) as background but not evidence, Kurtanidze's Third Amended Complaint, Dkt. 81 ("TAC").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.  Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] On November 22, 2024, the Court granted Kurtanidze's request for leave to file an amended complaint to add Mizuho Americas, the entity Kurtanidze represents was his "actual employer" during part of the relevant employment period.  Dkts. 60, 80.  Kurtanidze was transferred from Mizuho Bank to Mizuho Americas on January 1, 2021.  Dkts. 57, 60.  Neither party offers a basis upon which to treat these related entities separately, and as such, the Court refers to them as a collective.  *See Kashef v. BNP Paribas SA*, No. 16 Civ. 3228, 2021 WL 1614406, at *2 (S.D.N.Y. Apr. 26, 2021) ("It may be especially appropriate to refer to defendants collectively

with Mizuho Bank. JSF ¶¶ 7, 21; Pl. 56.1 ¶ 71. Both are subsidiaries of Mizuho Financial. JSF ¶ 21.

### B.    Kurtanidze's Employment at Mizuho

On December 27, 2016, Mizuho hired Kurtanidze as a vice president within the finance division of its Jersey City, New Jersey office. *Id.* ¶ 5. As part of the hiring process, Kurtanidze provided Mizuho with a background information sheet containing self-reported information about his employment history. *Id.* ¶ 3. He signed a certification stating that his employment "will" be terminated if Mizuho discovers that any information he provided was misleading or incomplete.[3] Pl. 56.1 ¶ 2.

Kurtanidze's work centered on projects related to United States regulatory reporting requirements. JSF ¶ 10. He was supervised by Satoshi Kinoshita from October 2017 through April 2019, *id.* ¶ 24, and by Jumpei Yoshida from April 2019 until he was terminated, *id.* ¶ 25. Kinoshita and Yoshida were both "rotational employees," *i.e.*, Japanese nationals assigned to work in the United States for a specified period. *Id.* ¶ 26. In November 2019, Mizuho's chief

---

where the defendants are related corporate entities, as opposed to unaffiliated entities or individuals, accused of acting in concert."); *see also, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Surgalign Spine Techs., Inc.*, No. 22 Civ. 9870, 2024 WL 477031, at *5 (S.D.N.Y. Feb. 7, 2024) ("[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." (citation omitted)).

[3] Kurtanidze represented in the background sheet that he left his previous role at Credit Suisse because he "[n]eeded more business exposure." Pl. 56.1 ¶ 3. At his deposition, however, Kurtanidze revealed for the first time that he had been involuntarily terminated from Credit Suisse due to a "security incident" involving entry into a space he was not authorized to enter. *Id.* ¶ 5. Kurtanidze also failed to disclose in his hiring materials, as was required, that he owned two limited liability companies that he continued to manage simultaneously with his employment at Mizuho. *Id.* ¶¶ 7–13. Mizuho states that, had it been aware of these misrepresentations, "Mizuho's policies and practices would have dictated that it terminate Kurtanidze's employment based on this information." *Id.* ¶ 14.

financial officer, David Kronenberg, announced a restructuring of its finance division in which Mizuho's finance groups would combine into one United States regional team titled the "Finance Change Group." *Id.* ¶¶ 7–9. After the restructuring, Kurtanidze's team was placed under the supervision of Yoshida and Bill Gavaris. *Id.* ¶ 29. Yoshida and Gavaris both reported to Colin Willox, the head of the Finance Change Group. *Id.* ¶¶ 7–9. Gavaris, Willox, and Kronenberg are white males. *Id.* ¶¶ 31, 34, 37.

In March 2020, after the onset of the COVID-19 pandemic, the finance change group migrated to full remote work. *Id.* ¶ 12. Kurtanidze worked from home from then until his termination on April 6, 2021. *Id.* ¶ 13. Kurtanidze's title was vice president throughout his Mizuho tenure. *Id.* ¶ 15.

As detailed more fully below, on April 6, 2021, Kurtanidze was terminated. *Id.* ¶ 13. The reasons stated for the termination were that his existing role had become redundant and that he lacked the skills to take on open roles at Mizuho. Pl. 56.1 ¶ 304.

Kurtanidze claims he was subjected to several forms of discrimination and retaliation during his tenure at Mizuho, including in connection with his termination. The facts Kurtanidze alleged as the basis for each claim—and the evidence adduced in discovery as to these—are as follows.

### 1.    Allegations and Evidence Relating to Race and National Origin

The following incidents and remarks pertain to Kurtanidze's claims based on race and national origin.

First, Kurtanidze states that two of his direct managers, Kinoshita and Yoshida, both Japanese, treated him worse on account of race and national origin. Kurtanidze recalls Kinoshita stating that "Kurtanidze's manner of discussion in meetings is not vice-president worthy" insofar

as, in Kurtanidze's telling, he was speaking "with a heavier Eastern European accent." *Id.* ¶ 51.

Kurtanidze also testified that Kinoshita "mentioned that Kurtanidze had a thick accent, and it

would be better if somebody who knows English well would lead the meetings." *Id.* ¶ 51.2.

Kinoshita thus asked one of Kurtanidze's colleagues, Irene Shum—a fellow vice president—to

lead meetings in Kurtanidze's place. *Id.* ¶ 55. Shum is neither of Japanese national origin nor of

Japanese descent. JSF ¶ 27. Kurtanidze testified that Shum, a "native New Yorker," was "better

versed in the English language," "had a way of explaining things," and was therefore "more . . .

able to lead the discussions." Pl. 56.1 ¶ 55.

Kurtanidze also testified that Kinoshita asked him, in "2018 or 2019," to take a course on

"cultural differences" between Japan and the United States. *Id.* ¶ 57.

Kurtanidze further testified that, although he could not recall specific racially hostile

statements by Yoshida, Yoshida's general demeanor was "rude and abusive towards the non-

Japanese people." *Id.* ¶ 69.1. He testified that Yoshida was "very nice" when Kurtanidze

initially joined the team to "increasingly rude. . . . He started being more and more controlling"

in that he "ask[ed] about [Kurtanidze's] whereabouts." *Id.* ¶ 70. Kurtanidze testified that

Yoshida "did not disrespect other Japanese employees . . . there were people in other divisions

who were Japanese, and over a conversation was completely different from him talking to me or

Irene and talking to Japanese people." *Id.* ¶ 70.2. He testified that Tomiya, a Japanese employee

on Kurtanidze's team, was "well taken care of in the company" and that Kurtanidze was

"mistreated compared to [Tomiya]." *Id.* ¶ 70.4.

Second, Kurtanidze states that, in September 2019, he was denied an opportunity to

transfer within Mizuho based on race and national origin. *Id.* ¶ 91–92. He testified that he was

"confident that had he been Japanese, he would be able to move out of Yoshida's team," and that

he "saw Japanese people easily switching departments." *Id.* ¶ 92 (cleaned up). When asked on what basis he believed the transfer decisions were based on race, Kurtanidze stated that this was an "intuitive" belief based on "general knowledge of Japanese culture." *Id.* The candidate selected to transfer over Kurtanidze was white. *Id.* ¶ 91 ("The hired candidate is a White, non-Japanese female named Cynthia Cray.").

Kurtanidze next states that he was denied promotions within the company in 2018 and 2019 because he is not Japanese. *Id.* ¶¶ 93–94. In 2018, Kurtanidze was passed over for a promotion to team leader in favor of Kinoshita, a Japanese national. *Id.* ¶ 94; TAC ¶ 21. Although Kurtanidze believes he was more qualified for a promotion than Kinoshita, Kurtanidze "admitted that he is unfamiliar with Kinoshita's employment background, including whether and in what capacity he was working within the [Mizuho] network prior to becoming team leader." Pl. 56.1 ¶ 95. And in 2019, Shum—a fellow vice president—was recommended for a promotion instead of Kurtanidze. *Id.* ¶¶ 66–67. Shum is neither of Japanese national origin nor of Japanese descent. JSF ¶ 27. Shum's overall performance rating from Mizuho management for the 2018 and 2019 fiscal years was "4 – Exceeding Some Expectations"—superior to Kurtanidze's rating both years of "3 – Meeting Expectations." Pl. 56.1 ¶¶ 281–84. Kurtanidze stated that, although he had asked about his promotion prospects, he never explicitly asked any of his managers to recommend him for a promotion. JSF ¶¶ 42–43.

Fourth, Kurtanidze initially claimed that he had been excluded from senior management-level calls and discussions on account of race, whereas similarly situated Japanese employees were asked to join them. Pl. 56.1 ¶ 60. Kurtanidze testified that those meetings were held in Japanese. *Id.* ¶ 60.2. Kurtanidze later, however, admitted that he "sometimes was, in fact, invited to such high-level meetings," that many meetings he initially claimed to have been

excluded from "involve[ed] management multiple levels above him," and that he "d[id] not know what was addressed at the meetings," or whether such meetings were relevant to his work. *Id.* ¶ 60.  And although Kurtanidze initially claimed that he had been required to undergo pre-employment testing that non-Japanese employees were not required to take, TAC ¶ 13, at his deposition, he was unable to identify a similarly situated Japanese employee who was not required to take the exam, Pl. 56.1 ¶ 89.

Fifth, Kurtanidze states that another employee, Junko Tamagawa, treated Kurtanidze differently on account of race.  *Id.* ¶ 105.  Kurtanidze states that Tamagawa was biased against him for "listen[ing] to a Japanese person" for advice on implementing a "logic design" rather than adopt a recommendation by Kurtanidze.  *Id.* ¶ 106.  Tamagawa, the parties agree, was not an employee at Mizuho; rather, a contract worker within the IT Department employed by an outside firm.  *Id.* ¶¶ 103–05.

### 2. Allegations and Evidence Relating to Gender and Caregiver Status

The following incidents and remarks pertain to Kurtanidze's claims based on gender and caregiver status.

Kurtanidze's third child was born in June 2019.  JSF ¶ 44.  He took paid parental leave as a "secondary caregiver" in June and July 2019 under Mizuho's parental leave policy.  *Id.* ¶ 53. The policy states that "primary caregivers" are entitled to up to 20 weeks' paid leave and "secondary caregivers" are entitled to four weeks' paid leave.  *Id.* ¶¶ 45–46.  A "primary caregiver" is defined as "[t]he individual who has sole or primary day-to-day responsibility for the daily tasks associated with the care and well-being of a child immediately following the birth. There can be only one primary caregiver." *Id.* ¶ 46 (cleaned up).  A "secondary caregiver" is defined in relevant part as the "individual who is responsible for working with or coordinating

with the primary caregiver in the care of a child following birth." *Id.* The policy provides that, "if an employee designates themselves as secondary caregiver, they cannot later change that designation to primary caregiver." Pl. 56.1 ¶ 113.4.

Kurtanidze contends—or has contended—that the following facts reflect discrimination and retaliation based on Kurtanidze's gender and his status as a caregiver for his children.

First, Kurtanidze originally claimed that Mizuho "denied his request" to serve as primary caregiver "because he is male" and that "Mizuho Bank's Human Resources asserted that only the mother of the child was entitled to leave of greater than eight weeks for the birth of a child." TAC ¶ 29. The parties, however, now agree that "[a]t no point before taking his parental leave in 2019, or during that parental leave, did Kurtanidze ask anyone in Human Resources (including anyone in Benefits) at Mizuho whether he could qualify as a 'primary caregiver' under Mizuho's paid parental leave policy." JSF ¶ 55. And Kurtanidze's wife was on continuous leave from her job from June through October 2019. *Id.* ¶ 56. Kurtanidze's wife was granted New York State Paid Family Leave "for the stated purpose of bonding with her newborn child" for most of that period. *Id.*

Second, Kurtanidze's TAC alleged that, during his paternity leave, Mizuho continued to "call him and send him emails requiring his attention." TAC ¶ 28. At his deposition, however, Kurtanidze retracted this allegation, stating that he had "no recollection" of doing work or being contacted by Mizuho employees during paternity leave. Pl. 56.1 ¶ 129.

Third, Kurtanidze states he was subjected to differential treatment by his managers for taking paternity leave. *Id.* ¶¶ 146–61. He recalls, in general terms, that his managers treated him "hostilely" when he returned from parental leave, whereas they were "respectful to him before he took parental leave." *Id.* ¶ 144 (cleaned up). In his deposition, Kurtanidze stated that the

8

attitudinal shift he perceived "could have changed before I even went to paternity leave." *Id.*
¶ 145. The only evidence Kurtanidze offers in support of this contention is his representation
that, upon his return from leave, he was given less desirable administrative tasks "such as
organizing issue trackers and scheduling meetings." *Id.* ¶ 162. But his year-end review from
that cycle contradicts that representation. Kurtanidze there "highlighted his work on various
substantive projects," including working on "an opportunity to shift from focus on a single
platform within Summix [to] vastly expand[ing] an exposure to larger universe of data and
processes," which "increases efficiency and potential for [his] group as a whole and each of its
members." Def. 56.1 ¶ 165. Kurtanidze testified that the statements he made in year-end
reviews were "truthful to his best belief and accurately reflected his point of view." Pl. 56.1
¶ 163.

  Fourth, Kurtanidze claims he was denied the opportunity to take extended leave to care
for family members during their illnesses. Pl. 56.1 ¶¶ 130–31. On October 4, 2019, Kurtanidze
emailed Mizuho Benefits asking whether he could take such leave, and, if so, the time to which
he was entitled. JSF ¶¶ 60–61. On October 7, 2019, a benefits coordinator responded:

> Hi David
>
> I'm sorry to hear that you and your family are going through a difficult time. In
> your email it sounds like you need additional time to care for some family members.
> If this is the case I would suggest that you contact Unum to apply for Family
> Medical Leave and possibly NY Paid Family Leave. I have attached the Unum
> brochure for your information. I hope this is helpful.

*Id.* ¶ 62. Kurtanidze responded the same day:

> Hi Iris,
>
> Thank you for the guidance, I will look at the information and discuss with manager
> if this can be aligned with the deliverables of my team.

*Id.* The benefits coordinator replied later that day:

Hi David

I would suggest that you contact Unum first to understand what benefits you are eligible for.

*Id*. The parties agree that, after that exchange, Kurtanidze never submitted to Unum a request for leave of any kind nor contacted Unum to inquire about a possible leave of absence. Pl. 56.1 ¶ 137. Kurtanidze was never told he was not permitted to take FMLA leave, New York State Paid Family leave, or any other family or medical leave provided for by any law or company policy. JSF ¶ 64. The only record of Kurtanidze's contact with Unum was in June 2021, two months after he was terminated, asking to be awarded retroactive benefits. Pl. 56.1 ¶ 138.

Records of text exchanges between Kurtanidze and Yoshida between November 29, 2019 and November 25, 2020 show that Yoshida accommodated several requests Kurtanidze made to care for his family members. Pl. 56.1 ¶¶ 149–60. The following messages are representative:

Yoshida: Good morning. Today in HPX [Jersey City office], please make progress [on] the discussion with AITD to get [an] answer from them about [the] questions you raised. . . . BTW, Irene is sick off today and she is saying she might be coming in tomorrow to catch up. Although I replied not to kill herself

Kurtanidze: Good morning Jumpei, will certainly do. I can also come to NY side during lunch time if necessary. . . .

Yoshida: No worries, you don't need to waste your time by moving to NY. Please try to complete ASAP and get back to home for your family.

\*       \*       \*

Kurtanidze: Hi Jumpei, first of all sorry for the tone on a call, my son has fever after surgery and I am nervous in general, i realize my comments may have been harsh, but in general frustration is coming from the fact that AITD is unnecessarily prolonging the fix of issues and dodging the question.

Yoshida: No worries, my daughter also has fever today so I can understand

Yoshida: Thank you for joining today at first

Kurtanidze:  . . . I will try to come in tomorrow but can only come in AM and stay for half day, have to go back home at lunchtime to make on time to doctor

Yoshida:  . . . No need to come in only for morning

Yoshida:  Please stay with your son

Yoshida:  Too long trip for only morning

*       *       *

Kurtanidze:  Jumpei, i hate to give such short notices but my wife just had to schedule an appointment for my son at 10 am tomorrow in manhattan.  I will send out an email tonight to Colin explaining in short what Henry said and whether he wants to follow up with Henry.  If he needs to hold a discussion then i can also schedule meeting in second half.  please let me know if it is acceptable and apologies again for a short notice

Yoshida:  Ok, if Colin wants you can set up a call tomorrow PM, right?

Yoshida:  Then it is ok

Kurtanidze:  sure

Kurtanidze:  thank you so much!

Yoshida:  Sure, please support your family first

Yoshida:  It is understandable since I am also dad

Yoshida:  Have a good night!

Yoshida:  😄

Def. 56.1 ¶¶ 149–54.

On March 9, 2020, Kurtanidze emailed Yoshida that he "was planning to come to work but all my kids are sick from this morning." *Id.* ¶ 151. Yoshida told Kurtanidze to "[p]lease take sick day off. I will approve it." *Id.* Yoshida added, "[s]ince I am also a father of two little kids, I am worried about the whole [COVID-19] situation but let's try to stay calm as much as possible." *Id.* Kurtanidze later wrote, "[f]or today I will be taking PTO to take care of kids," to

which Yoshida responded: "Understood. Please send me the sick off request then I will approve it. . . . You can send [it to] me tomorrow rather than today. . . . [T]ake care of you[r] kids please. Have a good day." *Id.* ¶ 151.

Kurtanidze reported in his year-end review from that cycle:

> [L]ast year was challenging for all of us for known reasons. However I had a great support from my team and felt confidence in resiliency through an empowering tone of our firm filled with courtesy and call to supporting each other. I have delivered my work as usual and yet had an opportunity of caring for my family as well during hard times with remote work allowance.

JSF ¶ 71.

### 3.    Allegations and Evidence Related to Disability

The following incidents and remarks pertain to Kurtanidze's claims based on two asserted disabilities: (1) carpal tunnel syndrome and (2) COVID-19 status.

#### a.    *Carpal tunnel syndrome*

Kurtanidze states that he was treated worse than non-disabled employees after requesting a reasonable accommodation for his carpal tunnel syndrome, which he claims worsened in or around December 2019 as a result of "overworking" at Mizuho. Pl. 56.1 ¶ 167. According to medical records, the condition arose in 2007 and is "most likely . . . related to degenerative disease in the cervical spine." *Id.* ¶ 170.

Kurtanidze recounts an instance in or around February 2020 in which, upon requesting physical therapy treatments during work hours, Yoshida told him he had "to deal with it outside of working hours." *Id.* ¶ 184. In his deposition, however, Kurtanidze stated that Yoshida permitted him to attend such appointments. *Id.* ¶ 191 ("Q. But he allowed you to go to the doctor. He didn't say you couldn't go? A. Yeah. He didn't refuse me to do things." (brackets removed)).

Kurtanidze worked from home between March 2020 and his termination in April 2021. JSF ¶ 13. In April 2020, Kurtanidze asked his supervisors for permission to "pace out" his workload so that he could take breaks as needed. Pl. 56.1 ¶ 198. His then-supervisor, Gavaris, approved the request and asked Kurtanidze to "let us know as well if the load (at points) is too much for the time that it is expected." *Id.* Kurtanidze responded that he "can work under much higher workload and do[es]n't mind at all." *Id.* After Kurtanidze's break schedule was approved, he "never again raised with either Gavaris or Yoshida the issue of his carpal tunnel syndrome or hand or wrist pain; never again raised the issue of 'pacing out' his work in light of his carpal tunnel syndrome or hand or wrist pain; never told Gavaris or Yoshida that his workload was too heavy in light of pain or numbness in his wrist or hand, or in light of carpal tunnel syndrome; and never told Gavaris that he needed a reduced workload because of pain or numbness in his wrist or hand, or because of carpal tunnel syndrome." Pl. 56.1 ¶ 210; JSF ¶¶ 78–80.

In his complaint, Kurtanidze alleged an instance where Mizuho rejected a request for an ergonomic keyboard and mouse. TAC ¶ 24. But the parties now agree that Kurtanidze "never advised anyone in Human Resources at Mizuho that he needed any type of accommodation to address his carpal tunnel syndrome or hand or wrist pain." JSF ¶ 82. Colin Willox, the finance group head who ultimately terminated Kurtanidze, testified that he was never made aware of Kurtanidze's carpal tunnel or a request for an accommodation. Pl. 56.1 ¶ 215 ("Never once had [Kurtanidze] ever approached me to say can we make accommodations in any way, because I can promise you—and you can ask anyone on any of my teams that I have run in the last thirty years—I would bend over backwards to make that happen. He didn't.").

After Kurtanidze's employment was terminated in April 2021, Kurtanidze initiated a worker's compensation benefits claim for his carpal tunnel syndrome. JSF ¶ 86.

### b.    COVID-19

Kurtanidze next contends that he was treated hostilely for taking time off work due to a COVID-19 infection. Mizuho, after the onset of the pandemic, instituted a policy allowing employees to take unlimited paid sick days, *see* Pl. 56.1 ¶ 241. The policy states that Mizuho "reserves the right to request verification for absences." *Id.* ¶ 242. Kurtanidze took approved sick leave between March 14, 2021 and March 19, 2021, *id.* ¶ 246–51, notwithstanding his claim that he "did not feel comfortable" taking days off "based on Yoshida's conduct during that time period," *id.* ¶ 241.1.

Kurtanidze states in general terms that Yoshida mistreated him after he took time off for illness, in that he "stopped inviting [Kurtanidze] to meetings necessary for his job" and "demanded evidence in the form of a positive test result from Plaintiff" before approving time-off requests. *Id.* ¶¶ 257; TAC ¶ 76. Kurtanidze has also claimed that Yoshida did not accommodate Kurtanidze's requests to visit a doctor during work hours. Pl. 56.1 ¶ 190.1. During Kurtanidze's deposition, however, he could not recall a specific instance in which a request was denied. Pl. 56.1 ¶ 191. Records of communications between Yoshida and Kurtanidze between January 19, 2021 and March 19, 2021, reflect Yoshida's approval Kurtanidze's various requests for time off due to illness:

> Kurtanidze:  last week student in my daughters daycare also had a covid, not only all kids are now home but i am also worried because i don't feel well, hopefully psychological but will take text on wednesday
>
> Yoshida:  Oh, sorry to hear that. Please let me know the results when you get. If you take test Wednesday, it is highly likely to be delivered to you by the end of this week?

Kurtanidze:  i think results are instant, like 15 minutes

Yoshida:  Oh, so quick. Hope you are negative though

Kurtanidze:  Im always positive but this time hopefully i'll be negative 😊

*        *        *

Yoshida:  Hi, did you have chance to take test?

Kurtanidze:  Hi Jumpei, I couldn't.[] was unable to leave from home . . . .

Yoshida:  Hope you could recover over the weekend

*        *        *

Kurtanidze:  Hi Jumpei, unfortunately i still have not recovered, actually got much worse but will try to see if i am functional tomorrow or otherwise i will have to take a sick day

Yoshida:  Hi, David.  Oh, that's too bad.  Hope you could feel a little bit better tomorrow.  Please take care of yourself well and let me know how you feel tomorrow morning

*        *        *

Kurtanidze:  Hi Jumpei, i have to ask for more sick days, me and my wife are both sick and in a very complicated situation with kids.  they will all have to stay home and until we know on wednesday if it is covid or not we cannot even get someone to help us with kids

Kurtanidze:  also i am taking flu medication so i will have to refrain from taking on calls not to sound too agitated but i will try to dial in to them and check emails.  and please let me know if there is anything critical, I will do everything possible to complete the task even if i am not feeling well

Kurtanidze:  260 sick days so let's submit.  i will work anyways but in case there is any question why i cant join meetings fully that will cover

Yoshida:  Ok

Yoshida:  260 days are a lot

*        *        *

Yoshida:  Hi.  Just to check on you but how do you feel?

Yoshida:  And your family?

Yoshida:  Hope you and your family is getting better

Kurtanidze:  Hi Jumpei, i am getting much better but wife and kids are still sick. Hopefully everyone recovers

Yoshida:  Good to[] know

Yoshida:  Did you take test?

Kurtanidze:  i had no chance to leave the house so couldn't do the test.  it was bad but not that severe to go to hospital, just a strong flu

JSF ¶¶ 101–08.

Kurtanidze originally represented that Yoshida "threaten[ed] Plaintiff's job, stating that if Plaintiff did not recover quickly, his job would be at risk." TAC ¶ 78.  He has since withdrawn that allegation.  JSF ¶¶ 109–11.

### C.    Kurtanidze's Termination

On April 6, 2021, Kurtanidze was terminated. *Id.* ¶ 121.  Approximately six months earlier, on September 29, 2020, Willox sent the following email to Yoshida and Gavaris:

Gents

I have heard a few rumblings on David.  Please ensure that you address these issues/ observations wrt his performance in the mid year reviews.

I would like to review your feedback prior to submitting back to him please.  Happy to discuss when appropriate

Thanks

Colin

*Id.* ¶ 113.  Yoshida's 2020 mid-year performance review for Kurtanidze's states in part:

Areas for improvement:  When dealing with RTB challenges / issues, in his role as 'change agent', David is expected to propose solutions & alternatives to assist our RTB colleagues in solving for these challenges to maintain progress in the project. There have however been a few instances where I believe David could have been

more collegiate and collaborative with our Finance and EPMO colleagues to better understand their issues and listen to their feedback / suggestions. This has not always happened, resulting in some heated discussions and disagreements which I believe could have been avoided. (A recent example occurred in discussions with FARR and EPMO with regards to Off Balance sheet data for FRY 15)[.] Going forward I would like to see David focus more on discussing tactical and strategic solutions in a more collaborative manner to forge a stronger relationship and trust among our Finance and EPMO members.

*Id.* ¶ 115.

On February 10, 2021, Willox sent the following email to Yoshida:

Jumpei

Plse [sic] send me a few bullets on what David has been working on over the course of the last 6–9 months.

I believe much of this has centered around Sumx analysis and testing for reports that we have now gone live with.

*Id.* ¶ 118. Yoshida responded to Willox with a list of tasks in which Kurtanidze was involved, noting that "one of the major tasks [for] our team" was slated to be "finished by the end of this month." *Id.* ¶ 119. On February 12, 2021, Willox sent the following email to Mizuho human resources coordinator Florencia Luccioni:

Florencia

Pursuant to our efforts & mandate to reduce costs I am looking to release David Kurtanidze in the new fiscal year (April). David was originally hired by BK Finance to assist with the Regulatory reporting efforts. Following the creation of Finance Shared services, David was assigned to my CTB team.

We recently went live with key BHC reports that David was originally hired to focus on – most notably/recently the FRY15 report. Now that we have completed testing and gone live, his regulatory role is for all intents and purposes redundant.

And although we have a fairly extensive Change Book of work for Securities, David unfortunately does not possess the requisite SME skills I require to be able to leverage him on the Securities Finance Transformation Project (at a VP level). The CTB [SME] skillset (at AVP level) I require in my team is articulated below.

Could you plse [sic] let me know next steps to action this termination[?]  Feel free
to call me if you require additional information or have any questions.

Kind regards

Colin Willox

*Id.* ¶ 120.

On April 6, 2021, Gavaris terminated Kurtanidze on a virtual call.  *Id.* ¶ 121.  Luccioni

was the only other participant on the line.  *Id.*  Kurtanidze was succeeded by Robert Latin, an

African-American male.  Pl. 56.1 ¶ 316; Luccioni Decl. ¶ 29.

### D.    Procedural History

On August 8, 2023, Kurtanidze filed this lawsuit in New York State Supreme Court in

Manhattan.  Dkt. 1-1.  On October 4, 2023, Mizuho removed the case to this Court.  Dkt. 1.  On

March 13, 2024, following briefing on a motion to dismiss, the Court issued a decision

dismissing several claims and narrowing others.  Dkt. 30.  On April 2, 2024, the Court held an

initial conference and set a discovery schedule.  Dkts. 31, 36.  On April 19, 2024, Kurtanidze

filed an amended complaint and Mizuho answered.  Dkts. 40–41.

On November 25, 2024, Kurtanidze filed the TAC, the operative complaint today.  It

added Mizuho Americas as a defendant.[4]  Dkt. 81.  On February 20, 2025, pursuant to the

schedule set by the Court, Dkt. 98, Mizuho filed a motion for summary judgment and supporting

materials, Dkts. 107–14.  On March 27, 2025, Kurtanidze filed an opposition and supporting

materials.  Dkts. 120–23.  On April 10, 2025, Mizuho replied.  Dkt. 129.

---

[4] Mizuho had opposed Kurtanidze's motion to add Mizuho Americas, Dkt. 66, but the Court, at a
November 21, 2024 conference at which it also resolved discovery disputes, granted that motion,
Dkts. 75, 80.

## II. Applicable Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. The Court must, in making this determination, view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant satisfies its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in deciding whether to grant summary judgment "because direct evidence of

discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). But "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in such a case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III.    Discussion

Kurtanidze brings claims of discrimination based on a range of protected characteristics. Under the NYSHRL and NYCHRL, he claims discrimination based on race, national origin, caregiver status, gender, and disability. Under 42 U.S.C. § 1981, he separately claims race discrimination. And, under the FMLA, NYSHRL, and NYCHRL, he brings claims for retaliation based on his caregiver status, gender, and disability.

As developed below, however, discovery has not uncovered admissible evidence sufficient to support any of these allegations. There being no triable issue of material fact, the Court grants summary judgment to Mizuho on each claim.[5]

---

[5] The parties debate a threshold question of whether Kurtanidze may recover, under the NYSHRL and NYCHRL, for adverse actions taken before August 8, 2020. As Mizuho acknowledges, this issue is of little consequence, because Kurtanidze's April 2021 termination, the central adverse action at issue, is undisputedly timely challenged, as that event is within the statutes' three-year limitations period.

### A.    Claims Based on Race and National Origin

Where subject-matter jurisdiction is premised solely on the existence of federal claims,

the Court ordinarily first considers whether those claims were adequately pled; if not, the Court

considers whether to exercise supplemental jurisdiction over pendent state- and city-law claims.

*See Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs Ret. Plan v. Morgan Stanley*

*Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) ("[I]n the usual case in which all federal-law

claims are eliminated before trial, the balance of factors to be considered under the pendent

jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward

declining to exercise jurisdiction over the remaining state-law claims." (citation omitted)).  Here,

---

The only adverse act Mizuho challenges as untimely is its alleged refusal to accommodate Kurtanidze's April 2020 request to "pace out" his work by taking breaks. Def. Br. at 5.  That refusal is a basis for Kurtanidze's failure-to-accommodate disability claim.  Kurtanidze argues that that claim is timely based on New York State Executive Order 202.8 (the "Covid Toll"). That order, issued by New York's Governor on March 20, 2020, after the onset of the COVID-19 pandemic, tolls the limitations period for NYSHRL and NYCHRL claims for the 228 days between March 20, 2020 and November 3, 2020. *See Shin v. NBC Universal Media, LLC*, No. 23 Civ. 10996, 2025 WL 438297, at *7 (S.D.N.Y. Feb. 7, 2025).  The Court, consistent with others, finds the Covid Toll applicable here, and thus treats as timely Kurtanidze's state- and city-law claims based on his April 2020 request. *See, e.g., Shin*, 2025 WL 438297, at *10 (tolling New York state-law claims under the Covid Toll); *Charles Equip. Energy Sys., LLC v. INNIO Waukesha Gas Engines, Inc.*, No. 22 Civ. 2716, 2023 WL 2346337, at *1 n.1 (S.D.N.Y. Mar. 3, 2023) (same); *Bell v. Saunders*, No. 92 Civ. 256, 2022 WL 2064872, at *5 (N.D.N.Y. June 8, 2022) ("District courts in this Circuit have agreed and found that Executive Order 202.8 and subsequent orders tolled the statute of limitations period [for New York state-law claims] from March 20, 2020 through November 3, 2020, a total of 228 days."); *Miehle-Kellogg v. Cnty. of Suffolk*, No. 19 Civ. 4943, 2024 WL 5120017, at *10–11 (E.D.N.Y. Dec. 16, 2024) (collecting cases).

To the extent Kurtanidze cites as background facts ones predating the applicable limitations, as the Court explained in its ruling on Mizuho's motion to dismiss, the limitations period barring claims based on discrete acts outside the limitations period does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Kurtanidze*, 2024 WL 1117180, at *11 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), and *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) ("[R]elevant background evidence . . . may be considered to assess liability on the timely alleged act.")).

however, there is an independent basis—diversity jurisdiction—to exercise jurisdiction over the plaintiff's non-federal claims. Thus, even if Mizuho's summary judgment motion were granted on Kurtanidze's federal claims, the Court would still need to evaluate Mizuho's motions directed to Kurtanidze's state- and city-law claims. Accordingly, as to the claims of race and national origin discrimination, which are brought under federal, state and city law, the Court begins with the claims under the statute with the most lenient standards of liability—the NYCHRL. *See, e.g., Lettieri v. Anti-Defamation League Found.*, No. 22 Civ. 9889, 2023 WL 5152447, at *4 (S.D.N.Y. Aug. 10, 2023) (similarly so proceeding). The NYCHRL's liability standards have always been held more lenient than those of § 1981 (which is interpreted coextensively with Title VII). *See Moore v. Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 500 (S.D.N.Y. 2013); *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 65–66 (S.D.N.Y. 2016). And the NYSHRL's standards, which until a recent amendment had been keyed to the more demanding federal-law standards, today remain no less demanding than those of the NYCHRL.[6] *See Moore*, 999 F. Supp. 2d at 500 (employment discrimination claims brought under § 1981, the NYSHRL, and NYCHRL are all subject to the same standards, but the NYCHRL features a "uniquely broad" standard); *Nieblas-Love*, 165 F. Supp. 3d at 65–68. Therefore, if Kurtanidze's race- and national origin-based claims fail under the NYCHRL's more permissive standard of liability, it

---

[6] Under a 2019 amendment, the NYSHRL is to be construed "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed." N.Y. Exec. Law § 300. The caselaw, however, has yet to definitively resolve whether the NYSHRL is now to be construed *in pari materia* with the NYCHRL, or whether the state law requires more. *See Lettieri*, 2023 WL 5152447, at *13 n.15 (comparing *Arazi v. Cohen Bros. Realty Corp.*, No. 20 Civ. 8837, 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) ("After that amendment, the standard for NYSHRL aligns with the NYCHRL standard for claims that accrued on or after October 11, 2019."), *with Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) (amendment brings NYSHRL "closer to" NYCHRL standard)).

follows that the parallel claims under § 1981 and the NYSHRL similarly fail. *See Lettieri*, 2023

WL 5152447, at *4 (similarly so concluding); *Cadet v. All. Nursing Staffing of New York, Inc.*,

632 F. Supp. 3d 202, 235 (S.D.N.Y. 2022); *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d

429, 454 (E.D.N.Y. 2013) ("[W]here a plaintiff cannot sustain a claim pursuant to the broader

NYCHRL standard, the plaintiff's NYSHRL and Title VII claims also fail.").

### 1.    Applicable Law

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice for an

employer or an employee or agent thereof, because of the actual or perceived race or national

origin of any person, to refuse to hire or employ or to bar or to discharge from employment such

person or to discriminate against such person in compensation or in terms, conditions or

privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a) (cleaned up). "Thus, where an

adverse employment action is shown to be 'motivated by racial or ethnic animus, even in part,

the defendant may be held liable' under the NYCHRL." *Farmer v. Shake Shack Enters., LLC*,

473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (quoting *Williams v. N.Y.C. Transit Auth.*, 97

N.Y.S.3d 692, 695–96 (2d Dep't 2019)). To prevail on summary judgment, "the plaintiff need

only show differential treatment—that she is treated 'less well'—because of a discriminatory

intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)

(citation omitted). "[T]he challenged conduct need not even be 'tangible' (like hiring or firing)."

*Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 (2009)); *see also E.E.O.C. v.*

*Bloomberg L.P.*, 967 F. Supp. 2d 816, 886 (S.D.N.Y. 2013) ("[A] plaintiff does not reach a jury

under the NYCHRL simply because she filed a complaint; she must show that she was treated

less well because of her protected status." (emphasis removed)). But the NYCHRL's broad

reach is not limitless. "[A] plaintiff's 'mere subjective belief that he was discriminated against

because of his race does not sustain a race discrimination claim.'" *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 309 (E.D.N.Y. 2014) (citation omitted), *aff'd*, 594 F. App'x 29 (2d Cir. 2015).

### 2.    Analysis

Under the NYCHRL, "a discriminatory motive can be shown either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that comparators were treated better than the plaintiff was." *Lettieri*, 2023 WL 5152447, at *9 (collecting cases); *Nieblas-Love*, 165 F. Supp. 3d at 68 (to overcome a summary-judgment motion, plaintiff must "link [defendant's] behavior to a[] discriminatory (or retaliatory) motive or intent."); *Bloomberg*, 967 F. Supp. 2d at 860. Courts evaluating the sufficiency of evidence on a motion for summary judgment must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Id.* at 66 (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)). "[A]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id*; *see also Winston v. Verizon Servs. Corp.*, 633 F.Supp.2d 42, 49 (S.D.N.Y.2009) (observing that the NYCHRL does not alter "the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56").

The admissible evidence Kurtanidze has adduced viewed in the light most favorable to him, however, shows neither direct nor indirect evidence of discrimination. There is thus no genuine issue of fact whether Kurtanidze was "treated less well" on account of his race or national origin. *Mihalik*, 715 F.3d at 110.

Kurtanidze first cites stray comments by Mizuho managers that he contends support direct evidence of discrimination based on race and national origin. His TAC had alleged that he was told by Kinoshita that he should be "more like a Japanese employee," that he was ridiculed for his Eastern European accent, and that a Japanese colleague refused "to listen to [Kurtanidze's] instructions because of [his] ethnicity" while instead taking advice from a Japanese employee rather than adopt Kurtanidze's recommendation. TAC ¶¶ 23, 34, 53.

But those allegations proved in discovery to lack evidentiary support. Kurtanidze admitted at his deposition that he "does not recall Kinoshita actually saying" that he should become more like a Japanese employee. Pl. 56.1 ¶ 57; *Stein v. United States*, No. 7 Civ. 2684, 2009 WL 195953, *5–6 (S.D.N.Y. Jan. 28, 2009) ("Failure to recall is not, without more, sufficient to survive summary judgment once discovery is complete." (cleaned up) (citing *G–I Holdings, Inc. v. Baron & Budd*, 218 F.R.D. 409, 414 (S.D.N.Y. 2003)). Kurtanidze stated that he "recalls *only* that Kinoshita asked him in 2018 or 2019 to take a course on cultural differences between Japan and the United States that he believed Mizuho offered," and that Kurtanidze "*surmised* that the reason was that Kinoshita didn't like the way [Kurtanidze] interacted with him and wanted him to be more like a Japanese employee." Pl. 56.1 ¶ 57 (emphasis in original). Pressed whether Yoshida had made any explicit statement leading him to conclude he was being treated differently on account of race, Kurtanidze stated that "[Yoshida] didn't—there's nothing that I would recall that he specifically said. I wouldn't be able to find an example like that. . . . He was not explicitly, but implicitly he was." *Id.* ¶ 69.

The limited statements recalled by Kurtanidze are innocuous and vague. They do not support an inference of race discrimination. *See Nieblas-Love*, 165 F. Supp. 3d at 68 ("Th[e] allegations, founded on nothing more than Plaintiff's self-serving *ipse dixit*, are . . . insufficient

to defeat a motion for summary judgment."). And Kurtanidze did not muster any other evidence of statements directed at him, or at similarly situated comparators, so supporting. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (comparator must be "similarly situated in all material respects" to plaintiff). Such does not give rise to an issue of material fact. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 22 Civ. 8139, 2024 WL 1251177, at *4 (S.D.N.Y. Mar. 22, 2024) ("To overcome a motion for summary judgment the plaintiff may not rely on conclusory statements, conjecture, and inadmissible evidence, but instead must offer some hard evidence showing that his version of the events is not wholly fanciful." (cleaned up) (citing *Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011), and *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Farmer*, 473 F. Supp. 3d at 330 (a plaintiff's "mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim.").

Kurtanidze also initially alleged that he had been discriminated against based on his accented English. TAC ¶ 23. He had claimed that Kinoshita told him that his "manner of discussion in meetings is not vice-president worthy" because Kurtanidze was speaking "with a heavier Eastern European accent." Pl. 56.1 ¶ 51 (cleaned up). In his deposition, however, Kurtanidze abandoned that allegation. He testified that Kinoshita "did not say anything about his accent in this regard, but rather, objected to the fact that Kurtanidze 'corrected' him in a group meeting in a way that Kinoshita deemed 'not vice president-worthy' on Kurtanidze's part." *Id.* ¶ 51 (quoting Yennock Decl., Ex.2). Kurtanidze also testified that Shum replaced him as team lead at such meetings—but because Shum, like Kurtanidze, is neither of Japanese national origin nor descent, JSF ¶ 27, that action does not favor (if anything, it undermines) his assertion that Mizuho favored Japanese employees. Indeed, Kurtanidze testified that Shum was "a very well-

spoken person" who "had a way of explaining things" and thus was "more able to lead the discussions." Pl. 56.1 ¶ 55 (cleaned up). Shum's relative competence over Kurtanidze, supplies an obvious race-neutral explanation for Mizuho's decision to substitute Shum for Kurtanidze as team lead. *See Hamburg v. New York Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 35 (1st Dep't 2017) ("[I]n a [NYCHRL] discrimination case, an attack on the employer's business judgment does not give rise to the inference that the employee's discharge was due to . . . discrimination." (citation omitted)); *see also Uttarwar*, 2024 WL 1251177, at *18 (granting summary judgment to defendant on NYCHRL claim where the cited "instances of alleged discrimination . . . are facially race-neutral, and plaintiff has not established an adequate basis permitting a trier of fact to infer that the alleged discriminatory conduct was motivated by plaintiff's race"), *aff'd*, No. 24-1085-cv, 2025 WL 704278 (2d Cir. Mar. 5, 2025).

Kurtanidze has also claimed that he was treated differently on account of race because a colleague, Tamagawa, adopted the professional advice of another Japanese colleague over Kurtanidze's. Pl. 56.1 ¶ 105–06. But the evidence revealed that Tamagawa was not a Mizuho employee. He was an independent contractor working for the IT department—a separate group from Kurtanidze's. *Id.* ¶¶ 103–05. Conduct of an agent or employee of the employer may be imputed to the employer itself under the NYCHRL only in three circumstances: where the offending employee "exercised managerial or supervisory responsibility," "where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action," or "where the employer should have known of the offending employee's unlawful discriminatory conduct yet failed to exercise reasonable diligence to prevent it." *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 529 (S.D.N.Y. 2015) (citing *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 479 (2010)). Here there is no

evidence, and Kurtanidze does not even attempt to argue, that any of these circumstances were present. In any event, such trivial "workplace slights" cannot, standing alone, sustain a claim for race discrimination. *Williams v. Victoria's Secret*, No. 15 Civ. 4715, 2017 WL 384787, at *11 (S.D.N.Y. Jan. 27, 2017) ("The federal courts cannot be wheeled into action for every workplace slight." (citation omitted)).

Kurtanidze has also claimed he was denied two promotions because he is not Japanese. TAC ¶¶ 40, 45. But in his deposition, he admitted that he never asked his managers to recommend him for such a promotion. Pl. 56.1 ¶¶ 99–101. And the purported comparators who were promoted over him—Kinoshita in 2018 and Shum in 2019—are not "similarly situated in all material respects," as they must be, to show disparate treatment on the basis of comparators. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Kurtanidze admitted that he was "unfamiliar" with Kinoshita's employment background, "including whether and in what capacity he was working within the [Mizuho] network prior to becoming team leader." Pl. 56.1 ¶ 95; *see Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (comparator not similarly situated where plaintiff fails to "describe who the comparators are, what their responsibilities were, how their workplace conduct compared to plaintiff's, or how they were treated" (cleaned up)); *Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 205 n.19 (E.D.N.Y. 2018) (employees not similarly situated where one has "greater . . . duties" than the other). And Kurtanidze admits that Shum was "more . . . able" than he in relevant respects. Pl. 56.1 ¶ 55. Shum also consistently earned higher performance reviews from management than Kurtanidze. *Id.* ¶¶ 280–84. And Shum, like Kurtanidze, is not Japanese, thus making Shum's promotion over him irrelevant to the inference he urges that Mizuho discriminates against non-Japanese individuals. *Cf. White v. Pacifica Found.*, 973 F. Supp. 2d 363, 380–81 (S.D.N.Y. 2013);

*DeJesus v. Dist. One Cmty. Educ. Council*, No. 8 Civ. 10666, 2010 WL 3959624, at *4

(S.D.N.Y. Sept. 14, 2010) ("The fact that plaintiff's immediate replacement is of the same

protected classes effectively precludes plaintiff from establishing that her termination occurred

under the requisite circumstances giving rise to an inference of discrimination.").

Finally, although Kurtanidze alleged he was excluded from meetings in which similarly

situated Japanese employees were included, *see* TAC ¶ 2, he later testified that such meetings

involved employees in "management multiple levels above him" and that he "d[id] not know

what was addressed at the meetings," or whether these meetings were relevant to his work, Pl.

56.1 ¶ 60.  These obvious race-neutral explanations for including others and not him fail to

support that he was thereby discriminated against even in part due to race. *See, e.g, Marseille v.*

*Mount Sinai Health Sys., Inc.*, No. 18 Civ. 12136, 2021 WL 3475620, at *7 (S.D.N.Y. Aug. 5,

2021) (where there exists "evidence in admissible form of one or more non-discriminatory

motivations for its actions, a court should ordinarily avoid the unnecessary and sometimes

confusing effort of going back to the question of whether a prima facie case has been made out in

the first place" (citing *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 120 (1st Dep't

2011)); *Henderson v. Physician Affiliate Grp. of N.Y. P.C.*, No. 18 Civ. 3430, 2019 WL

3778504, at *4 (S.D.N.Y. Aug. 12, 2019) (although the NYCHRL is broad, the plaintiff "must

still adduce evidence supporting an inference of discrimination.").

The admissible direct and circumstantial evidence thus does not support, at all, an

inference that Kurtanidze, in any manner, was discriminated against based on his non-Japanese

race and national origin.  That requires entry of summary judgment for Mizuho on these claims.

*See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations,

speculation or conjecture will not avail a party resisting summary judgment.").

In any event, although not necessary to this decision, the record supplies an obvious race-neutral explanation for Kurtanidze's termination. In September 2020, Willox noted that he had received complaints from clients about Kurtanidze, reflected in the company's mid-year performance review for Kurtanidze. Pl. 56.1 ¶ 261–62. Willox observed in meetings, and heard from Mizuho stakeholders, that "[Kurtanidze] had his own mind as to what needed to be done despite people telling him this is what we are asking for, this is what we need." *Id.* ¶ 262. Gavaris, Kurtanidze's direct supervisor at that time, testified that Kurtanidze became known for "not being collaborative, not being client-facing, as we call it in our business, not being helpful[.]" *Id.* ¶ 263. Gavaris also had conversations with stakeholders about "issues that came up in meetings where Kurtanidze was arguing, combative, and not being agreeable." *Id.* ¶ 265 (cleaned up); *see also id.* ¶¶ 310–11 (Kurtanidze's "antagonistic" and "defensive" demeanor was a "large part" of the decision to terminate employment). In addition, on February 12, 2021, Willox sent an email to Mizuho's human resources coordinator noting that a major project on which Kurtanidze had been staffed had been completed. *Id.* ¶ 304. As such, Willox explained that, "pursuant to our efforts and mandate to reduce costs I am looking to release David Kurtanidze. . . . We recently went live with key [] reports that David was originally hired to focus on—most notably/recently the FRY15 report. Now that we have completed testing and gone live, his regulatory role is for all intents and purposes redundant." *Id.*; JSF ¶ 120. Kurtanidze was ultimately replaced by an African-American, non-Japanese employee. Pl. 56.1 ¶ 316. Kurtanidze has not pointed to evidence refuting or exposing as pretextual the evidence supporting Mizuho's account of his termination as based on his perceived performance and its perceived staffing needs, as opposed to his being non-Japanese.

The assembled evidence thus—in addition to not permitting the necessary finding that Kurtanidze was terminated on account of his race or national origin—supplies unrebutted evidence that that decision was based on permissible considerations. *See Marseille*, 2021 WL 3475620, at *7 (obvious non-discriminatory motive undermines credibility of discrimination claim); *Hamburg*, 62 N.Y.S.3d at 35 (disputing employer's business judgment does not give rise to inference of discrimination under the NYCHRL).  And Willox and Gavaris, the two Mizuho supervisors who were the central decisionmakers with respect to Kurtanidze's termination, are also white. *See Tucker v. New York City*, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African-American."); *Trower v. Mount Sinai Hosp.*, No. 16 Civ. 4322, 2018 WL 4283724, at *7 (S.D.N.Y. Sept. 6, 2018) ("Where an individual alleged to have acted in a discriminatory fashion is a member of the same protected class as the plaintiff, that fact can be non-dispositive evidence weighing against an inference of discriminatory animus."); *White*, 973 F. Supp. 2d at 380 (though not a "conclusive presumption," a supervisor's membership in plaintiff's protected class tends to "undermine[]" the inference of discriminatory animus).

In the end, Kurtanidze's claim of race and national-origin discrimination reduces to conclusory intuitions and generalized allegations of hostility.  His claim that in any respect he was treated differently on account of these protected characteristics is unsupported by concrete evidence that could non-speculatively sustain that conclusion. *See Lettieri*, 2023 WL 5152447, at *7 ("[G]eneralized hostility or generally uncivilized behavior is not actionable. . . .  [T]he defendant's offending conduct must have been keyed to a protected characteristic of the plaintiff."); *Mihalik*, 715 F.3d at 110 ("It is not enough that a plaintiff has an overbearing or

obnoxious boss."); *see also id.* at 111 ("[P]etty slights and trivial inconveniences" do not sustain a discrimination claim under the NYCHRL).

Because Kurtanidze has not adduced evidence capable of establishing differential treatment based on race, his NYCHRL claims to this effect cannot survive summary judgment. It follows that summary judgment for Mizuho is likewise warranted on his claims to the same effect under § 1981 and the NYSHRL. *See Tortorici v. Bus-Tev, LLC*, No. 17 Civ. 7507, 2021 WL 4177209, at *14 (S.D.N.Y. Sept. 14, 2021); *Nieblas-Love*, 165 F. Supp. 3d at 65–66.[7]

**B.    Claims Based on Caregiver Status and Gender**

The Court next addresses Kurtanidze's discrimination and retaliation claims under the NYSHRL and NYCHRL, and his retaliation claim under the FMLA, based on his caregiver status and gender.

**1.    Discrimination Claims**

The Court again centers its analysis on the discrimination claims under the NYCHRL, because it has the most lenient liability standards. *See Mihalik*, 715 F.3d at 109. To clear

---

[7] Kurtanidze's TAC loosely asserted that he experienced a hostile work environment on account of his race and national origin, *see* TAC ¶ 96, although it did not bring an independent cause of action along these lines, and Kurtanidze did not defend any intended claim to this effect on summary judgment. *See United States v. Malka*, 602 F. Supp. 3d 510, 529 (S.D.N.Y. 2022) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citing *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013)). In any event, that claim would likewise fail at summary judgment for lack of evidentiary support. Under the NYCHRL, "[t]he standards for discrimination and hostile work environment are the same." *Raji v. Societe Generale Ams. Sec. LLC*, No. 15 Civ. 1144, 2018 WL 1363760, at *7 (S.D.N.Y. Feb. 28, 2018); *Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (same); *Clarke v. Intercontinental Hotels Grp., PLC*, No. 12 Civ. 2671, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims; rather, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based [on a protected characteristic]." (citation omitted)). Any hostile work environment claim here thus falls with the discrimination claim.

summary judgment, Kurtanidze again need only adduce evidence sufficient to show he was

"treated less well because of a discriminatory intent." *Farmer*, 473 F. Supp. 3d at 327 (cleaned

up) (citing *Mihalik*, 715 F.3d at 110); *Robinson v. De Niro*, 739 F. Supp. 3d 33, 119 (S.D.N.Y.

2023). And again, he may establish his employer's discrimination either through direct

evidence, such as comments indicating prejudice based on a protected characteristic, or

circumstantial evidence such as that comparators were treated better than he. *See Schiano*, 445

F.3d at 603; *Bloomberg*, 967 F. Supp. 2d at 860.

In sustaining Kurtanidze's claims for caregiver status and gender discrimination in the

face of Mizuho's motion to dismiss, the Court relied on two TAC allegations: that Mizuho

(1) told Kurtanidze it was denying him primary caregiver status because "the primary caregiver

is supposed to be the mother of the children," and as a "man . . . [Kurtanidze] cannot be the

primary caregiver," and (2) "criticiz[ed] Kurtanidze for abandoning the team to attend to his

son's medical emergency." *Kurtanidze v. Mizuho Bank, Ltd.*, No. 23 Civ. 8716, 2024 WL

1117180, at *16 (S.D.N.Y. Mar. 13, 2024). Discovery, however, has not adduced evidence that

could substantiate either allegation.

With respect to the first, the parties have stipulated that Kurtanidze never even applied to

qualify as the "primary caregiver" under Mizuho's parental leave policy. JSF ¶ 55 ("At no point

before taking his parental leave in 2019, or during that parental leave, did Kurtanidze ask anyone

in Human Resources (including anyone in Benefits) at Mizuho whether he could qualify as a

'primary caregiver' under Mizuho's paid parental leave policy."). Nor, on the facts stipulated,

was Kurtanidze qualified to do so. Under Mizuho's parental leave policy, a primary caregiver is

"[t]he individual who has sole or primary day-to-day responsibility for the daily tasks associated

with the care and well-being of a child immediately following the birth. There can be only one

primary caregiver." *Id.* ¶ 46 (cleaned up). Kurtanidze took parental leave as a secondary caregiver. Pl. 56.1 ¶ 120. And Mizuho policy was that "if an employee designates themselves as secondary caregiver, they cannot later change that designation to primary caregiver." *Id.* ¶ 113.4. Kurtanidze's wife was on continuous leave from her job from June 2019, when their third child was born, until October 2019, and was granted New York State Paid Family Leave during that period. JSF ¶ 56.

Given the above, Kurtanidze's first basis for alleging gender and caregiver discrimination is factually unsustainable. Not only is there no evidence that Mizuho denied Kurtanidze primary caregiver status—there is no evidence that he applied or even qualified for it. The parties also agree that Kurtanidze was "never specifically told he was not permitted to take . . . New York State Paid Family leave, or any other type of family or medical leave provided for by any law or by any policy of Mizuho." JSF ¶ 64 (emphasis added).

The second allegation that sustained these claims in the TAC, that Mizuho denied him a leave to attend to a child's medical emergency, also proves factually baseless. In an email exchange, Kurtanidze contacted Mizuho's benefits coordinator to inquire about taking extended leave, and the coordinator identified for him two methods by which he could properly request such leave. *Id.* ¶ 62. Kurtanidze replied that he "w[ould] look at the information." *Id.* But, as Kurtanidze admits, he never submitted a leave request "of any kind," and nor did he "make an inquiry . . . regarding a potential leave of absence." Pl. 56.1 ¶ 137.

Other factual representations that the TAC made in ostensible support of these claims have likewise been retracted or debunked. Contrary to a TAC allegation, *see* TAC ¶ 28, Kurtanidze "do[es]n't remember" doing work or being contacted by Mizuho employees during paternity leave, Pl. 56.1 ¶ 129. *See A.H. by Horowitz v. Precision Indus. Maint. Inc.*, 2021 WL

2417610, *3 (S.D.N.Y. June 14, 2021) (qualifications of testimony like "d[id] not quite recall" or "as far as [he] knew" made allegation mere speculation and thus "insufficient to create an issue of fact" (collecting cases)).  And contrary to a TAC allegation that Mizuho assigned Kurtanidze less desirable tasks and did so for taking paternity leave, *see* TAC ¶ 37, Kurtanidze described his post-leave work in contrary fashion, describing significant achievements on substantive projects, *see, e.g.*, Pl. 56.1 ¶ 165 (describing his "vastly expand[ing] exposure to larger universe of data and processes," which "increases efficiency and potential for my group as a whole and each of its members").  Kurtanidze has not pointed to admissible evidence that his post-leave assignments were a step down from earlier.  And Kurtanidze's subjective dissatisfaction with his assignments, to the extent he may still profess such, cannot form the basis for an actionable discriminatory treatment claim, especially insofar as there is no evidence to link such treatment to his protected status. *See Lettieri*, 2023 WL 5152447, at *7.  Nor is there evidence that such tasks fall outside his job description. *See Mihalik*, 715 F.3d at 111 (trivial inconveniences do not sustain a discrimination claim under the NYCHRL).

Nor has Kurtanidze adduced evidence to support his general allegation that Mizuho managers treated him poorly for taking paternity leave.  He admitted in his deposition that the shift he perceived in Mizuho management's attitude "could have changed before [he] even went to paternity leave." Pl. 56.1 ¶ 145(d).  And the contemporaneous communications on the subject—messages exchanged between Kurtanidze and Yoshida—do not support Kurtanidze's claim of or unaccommodating attitude towards family care needs. *See id.* ¶¶ 149–50.  Yoshida told Kurtanidze, for example, to "support your family first" and that "[i]t is understandable since I am also a dad"; on another occasion, Yoshida told Kurtanidze that his "daughter also has fever

today so I can understand" and urged him "get back to home for your family." *Id.* at 149–50, 154.

Kurtanidze's gender discrimination claims appear factually derivative of his deficient allegations of discrimination based on his caregiver status. In all events, although Kurtanidze's failure to adduce evidence supporting an inference of lesser treatment on account of his gender is alone dispositive of those claims, he has also failed to adduce evidence supporting that Yoshida, his primary supervisor, had an intent to discriminate against Kurtanidze on the basis of gender. On the contrary, both are male, and the fact that Yoshida is "[a] member of the same protected group" as Kurtanidze renders any inference of discrimination "implausible." *Grant v. New York Times Co.*, No. 16 Civ. 3175, 2017 WL 4119279, at *7 (S.D.N.Y. Sept. 14, 2017); *Meyer v. State of New York Off. of Mental Health*, 174 F. Supp. 3d 673, 688 (E.D.N.Y. 2016) ("[B]oth [decisionmakers'] status as women certainly undercuts Plaintiff's efforts to contend that there are disputed issues of material fact concerning her ability to prove a *prima facie* case of [gender] discrimination" (cleaned up)), *aff'd sub nom.*, 679 F. App'x 89 (2d Cir. 2017); *White*, 973 F. Supp. 2d at 380 (granting summary judgment on Title VII, NYSHRL and NYCHRL claims, and noting that "the fact that both [decisionmakers] are African–American undermines any possible inference of discriminatory animus." (cleaned up)).

Kurtanidze thus has not developed evidence supporting a claim of gender- or caregiver-based discrimination. He relies on generalized and conclusory allegations of lesser treatment. But a viable discrimination claim requires more than conclusory allegations. *See Gorzynski*, 596 F.3d at 101. The evidence adduced here cannot support the required showing: that Kurtanidze was treated "less well" based on these protected characteristics. *Farmer*, 473 F. Supp. 3d at 327; *Williams v. Regus Mgmt. Grp.*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011) (NYCHRL claim

failed on summary judgment where plaintiff could not show he "was treated differently from others in a way that was more than trivial, insubstantial, or petty").

The Court thus grants summary judgment to Mizuho on Kurtanidze's NYCHRL claims of gender and caregiver discrimination and on his parallel NYSHRL claims. *See, e.g., Tortorici*, 2021 WL 4177209, at *14 ("[B]ecause Plaintiff cannot sustain a claim pursuant to the more liberal NYCHRL standard, Plaintiff's . . . claim under the NYSHRL also fails."); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 582 (S.D.N.Y. 2012), *aff'd*, 526 F. App'x 124 (2d Cir. 2013).

### 2.    Retaliation Claims

Mizuho also moves against Kurtanidze's claims that Mizuho retaliated against him based on his caregiver status and gender, in violation of the FMLA, NYSHRL, and NYCHRL.

#### a.    FMLA[8]

Kurtanidze claims he was terminated for exercising his right to FMLA leave by requesting leaves of absence to care for his newborn child and to care for his father. The FMLA

---

[8] The Court's decision on Mizuho's motion to dismiss narrowed the scope of the FMLA claims to conduct on or after August 8, 2020. *See Kurtanidze*, 2024 WL 1117180, at *1. The adverse action after that date is Kurtanidze's April 6, 2021 termination. The other alleged such action, Yoshida's "curtailment" of Kurtanidze's work assignments, does not qualify as an adverse action under the FMLA. *See, e.g., Stanley v. City Univ. of New York*, No. 18 Civ. 4844, 2023 WL 2714181, at *12 (S.D.N.Y. Mar. 30, 2023), *aff'd sub nom.* No. 23-731-cv, 2024 WL 1453872 (2d Cir. Apr. 4, 2024).

Mizuho argues that the even the termination-based claim is time-barred. It notes that FMLA suits must be filed within two years of the latest alleged violation of the act, unless the violation was "willful," in which case the limitations period is three years. *See* Def. Br. at 11. Because Kurtanidze filed suit on August 8, 2023, a two-year limitations period would bar suits based on actions before August 8, 2021. *See id.* (citing *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 191 (S.D.N.Y. 2011)). The Court, however, for purposes of resolving the motion, assumes that if Mizuho's conduct were found actionable, it could be found willful, and treats this claim as timely for purposes of this motion.

entitles eligible employees to 12 work weeks of unpaid leave per year. 29 U.S.C. § 2612(a)(1).
While an employee is on FMLA leave, it is "unlawful for any employer to interfere with,
restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. *Id.*
§ 2615. To establish a *prima facie* case of FMLA retaliation, Kurtanidze must show that (1) he
exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered
an adverse employment action; and (4) the adverse employment action occurred under
circumstances giving rise to an inference of retaliatory intent. *See Potenza v. City of New York*,
365 F.3d 165, 168 (2d Cir. 2004).

The parties do not dispute the first three elements of Kurtanidze's *prima facie* retaliation
case. They differ only as to the fourth: whether evidence supports that the adverse employment
action at issue—Kurtanidze's termination—took place under circumstances giving rise to an
inference of retaliatory intent. Substantially for the reasons reviewed above, it does not.

There is no evidence, direct or indirect, that links Kurtanidze's termination to his taking
FMLA leave or his leave status. Kurtanidze now concedes, contrary to his initial allegation that
management had resisted his leave requests, that he was "never specifically told . . . that he was
not permitted to take FMLA leave, New York State Paid Family leave, or any other type of
family or medical leave provided for by any law or by any policy of Mizuho." JSF ¶ 64. And
the uniform evidence as presented to the Court supports that Mizuho management supported
Kurtanidze's leave requests. *See* Pl. 56.1 ¶¶ 149, 154 (Yoshida: "It is understandable since I am
also a dad"; "support your family first"; "get back to home for your family."). And Kurtanidze
admitted much the same in his 2020 self-performance assessment, written in March 2021, just
weeks before his termination. He wrote: "I had a great support from my team and felt
confidence . . . through an empowering tone of our firm filled with courtesy and call to

supporting each other. I have delivered my work as usual and yet had an opportunity of caring for my family as well." *Id.* ¶ 166.

Significant, too, Kurtanidze took his paternity leave nearly two years before his April 6, 2021, termination: in June and July 2019. JSF ¶ 61. The distance between those events means that no inference of retaliation can rise from temporal proximity. There is no "firm outer limit to the temporal proximity required [to prove a causal nexus between the adverse action and discriminatory intent]," but "most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference." *Lulo v. OTG Mgmt., LLC*, No. 19 Civ. 3776, 2022 WL 409224, at *5 (S.D.N.Y. Feb. 10, 2022); *see also Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503–04 (S.D.N.Y. 2010) (collecting cases). The gap between Kurtanidze's exercise of his FMLA rights and his termination is far longer than that.

There is no non-conclusory basis for Kurtanidze's claim that he was terminated for exercising FMLA rights. The Court thus grants summary judgment to Mizuho on this claim.

   *b.*  The *NYSHRL and NYCHRL*

Kurtanidze also claims he was retaliated against, in violation of the NYSHRL and NYCHRL, for attempting to exercise his rights under the FMLA. TAC ¶¶ 113–16. Specifically, Kurtanidze's TAC asserts three protected activities: (1) his request for paternity leave, (2) request for an extension of that paternity leave, and (3) request for leave to care for his father. *Id.* For several reasons, Kurtanidze has not adduced sufficient evidence to support a claim that he was retaliated against for these claimed protected activities, viewed separately or together.

As an initial matter, "[t]aking FMLA leave is not a protected activity within the meaning of the NYCHRL." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 367 (S.D.N.Y. 2016) (citing *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), and

N.Y.C. Admin. Code § 8-107).  Summary judgment for Mizuho is thus merited on the NYCHRL claim.

With respect to the NYSHRL, to make out a *prima facie* case, the plaintiff must show that (1) he engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action.  *See Dumay v. City of New York*, No. 9 Civ. 6866, 2011 WL 4901311, at *8–10 (S.D.N.Y. Oct. 13, 2011).  Such a claim fails for "lack of evidence of retaliatory motivation." *Lulo*, 2022 WL 409224, at *11.[9]

To begin, as noted, following discovery it is undisputed that Kurtanidze never requested the paternity leave extension or family leave.  *See* JSF ¶ 55 ("At no point before taking his parental leave in 2019, or during that parental leave, did Kurtanidze ask anyone in Human Resources (including anyone in Benefits) at Mizuho whether he could qualify as a 'primary caregiver' under Mizuho's paid parental leave policy."); Pl. 56.1 ¶ 137 (after email exchange with benefits coordinator, Kurtanidze never submitted a leave request "of any kind," and nor did he "make any inquiry . . . regarding a potential leave of absence").  There is thus no evidence that the second and third protected activities he claimed in the TAC ever occurred.

Second, as to the theory that Mizuho took adverse action against Kurtanidze because he had engaged in a protected activity—presumably requesting and taking paternity leave—the record is devoid of evidence that Mizuho was antagonistic to that leave or had any motive to retaliate again him for it.  Quite the contrary, as reflected above, Kurtanidze's request for that

---

[9] Although these claims survived Mizuho's motion to dismiss, see *Kurtanidze*, 2024 WL 1117180, at *16–17, Kurtanidze did not defend any of these claims in response to Mizuho's challenge to them, *see* Def. Br. at 22–24, on summary judgment.  Kurtanidze thereby abandoned these claims, independently meriting entry of summary judgment. *See Malka*, 602 F. Supp. 3d at 529; *Botti*, 711 F.3d at 313.

leave (and every other leave request he made) was granted. He has not adduced any evidence of resistance or hostility to that request. *See* JSF ¶¶ 63–64 (Kurtanidze "never specifically told" he was not permitted to take leave). The voluminous emails and text exchanges between Kurtanidze and his supervisors lack any indication that Mizuho did any other than support Kurtanidze's caregiver obligations. *See* Pl. 56.1 ¶¶ 149, 154 (Yoshida to Kurtanidze: "[I]t is understandable since I am also a dad"; "support your family first"; "get back to home for your family."); *see also id.* ¶ 166 (Kurtanidze reports in March 2021 that "I had a great support from my team and felt confidence . . . through an empowering tone of our firm filled with courtesy and call to supporting each other. I have delivered my work as usual and yet had an opportunity of caring for my family as well[.]"). And the adverse action on which Kurtanidze's TAC focuses, his termination in April 2021, came long after his paternity leave, defeating any temporal basis for inferring retaliation.

Accordingly, the Court grants summary judgment to Mizuho on Kurtanidze's retaliation claims under the NYSHRL and NYCHRL based on protective activities associated with his gender and caregiver status. *See, e.g., Lulo*, 2022 WL 409224, at *11 (dismissing retaliation claims under these statutes for lack of evidence of retaliatory motivation); *Nieblas-Love*, 165 F. Supp. 3d at 71 (same).

### C.    Claims Based on Disability

The Court next considers Kurtanidze's claims based on his asserted disabilities (carpal tunnel syndrome and COVID-19). Under the NYSHRL and NYCHRL, he brings (1) failure-to-accommodate, (2) discrimination, and (3) retaliation claims. He also brings a retaliation claim under the FMLA.

### 1.    Failure to accommodate

Kurtanidze first claims that Mizuho failed to accommodate his two asserted disabilities. A *prima facie* failure-to-accommodate claim under the NYCHRL requires a plaintiff to show that (1) plaintiff is a person with a disability under the NYCHRL; (2) an employer covered by the statute had notice of the disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations. *See Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 405–06 (S.D.N.Y. 2017) (quoting *Nieblas-Love*, 165 F. Supp. 3d at 73). An employer is required to engage in an "interactive process" upon notice of the need for an accommodation. *See id.* at 419 (citing *Romanello v. Intesa Sanpaolo S.p.A.*, 949 N.Y.S.2d 345, 348 (1st Dep't 2012)).

### a.    Carpal tunnel

Kurtanidze claims that Mizuho failed to accommodate requests he made related to his carpal tunnel syndrome. Only the fourth element of his *prima facie* case is disputed—whether Mizuho refused Kurtanidze's reasonable-accommodations request.

The record reflects two instances in which Kurtanidze requested accommodations for his carpal tunnel syndrome from his direct supervisors.

First, in February 2020, Kurtanidze recalls, he requested physical therapy visits during work hours. He originally contended that Yoshida told him he had "to deal with it outside of working hours." Pl. 56.1 ¶ 184. But, later in his deposition, Kurtanidze retracted that statement, admitting that Yoshida had permitted him time off to attend such therapy treatments. *Id.* ¶ 191.2 ("He said that I should manage my personal issues outside of the working hours. But he gave me two days off, yes, that's true. He gave me those days off."); *see also id.* ¶ 191 (Q. "But he allowed you to go to the doctor. He didn't say you couldn't go?" A. "Yeah. He didn't refuse

me to do things." (brackets removed)).  Kurtanidze did not ultimately identify any portion of the request that was denied; he has not adduced evidence on which a jury could find that even part of his request was refused.  And, asked why he did not obtain physical therapy, he testified, in the singular, that the reason was not a refusal by his managers, but because the COVID-19 pandemic prevented him from attending in-person treatments.  *Id.* ¶ 190 ("Q. '[Y]ou couldn't go to get physical therapy because of COVID-19; right?'  A. 'Yeah.' . . . 'Have you ever received physical therapy?'  A. 'We were in lockdown, so I did not.'").  Because Kurtanidze ultimately did not point to any specific request for work-hours physical therapy that was refused by Mizuho, this request cannot support liability under the NYCHRL.

Second, in April 2020, Kurtanidze asked his supervisors for permission to "pace out" his workload so that he could take breaks as needed.  *Id.* ¶ 198.  That request also cannot support liability, for two reasons.  For one, Kurtanidze by then was working entirely from home due to COVID-19, and he testified working from home itself afforded him relief in that it permitted him to manage his time and take breaks more regularly.  *Id.* ¶¶ 236–38.  And he did not point to any evidence that he was refused any accommodation with regard to how to manage his remote work.  For another, the documentary evidence adduced reflects emails in between Kurtanidze and his then-supervisor, Gavaris, in which Mizuho granted Kurtanidze's pace-out request.  *Id.* ¶ 198.  Indeed, Gavaris went beyond that, and asked Kurtanidze to "kindly let us know as well if the load (at points) is too much for the time that it is expected."  *Id.*  Kurtanidze responded that he "can work under much higher workload and do[es]n't mind at all."  *Id.*  Third, it is undisputed that, after Kurtanidze's accommodations request was approved, he "never again raised with either Gavaris or Yoshida the issue of his carpal tunnel syndrome or hand or wrist pain; never again raised the issue of 'pacing out' his work in light of his carpal tunnel syndrome or hand or

wrist pain; never told Gavaris or Yoshida that his workload was too heavy in light of pain or numbness in his wrist or hand, or in light of carpal tunnel syndrome; and never told Gavaris that he needed a reduced workload because of pain or numbness in his wrist or hand, or because of carpal tunnel syndrome." *Id.* ¶ 210.

The evidence also uniformly reflects that Kurtanidze forewent the mechanism at Mizuho for seeking accommodations for disabilities. The company's Employee Handbook, which Kurtanidze represented he reviews annually, JSF ¶¶ 19–20, advises employees to contact Human Resources should they need a reasonable accommodation for a disability. The parties have stipulated that "Kurtanidze never informed anyone in Human Resources (including anyone in Benefits) at Mizuho that he suffered from carpal tunnel syndrome or hand or wrist pain," *id.* ¶ 81, and that "Kurtanidze never advised anyone in Human Resources at Mizuho that he needed any type of accommodation to address his carpal tunnel syndrome or hand or wrist pain," *id.* ¶ 82, even though Willox testified that he would have "ben[t] over backwards" to accommodate Kurtanidze had he asked, Pl. 56.1 ¶ 215; *see also Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x. 943, 945–46 (2d Cir. 2008) (affirming grant of summary judgment where employer was receptive to the plaintiff's proposed accommodation, but plaintiff never made necessary arrangements); *Julius v. Dep't of Hum. Res. Admin.*, No. 8 Civ. 3091, 2010 WL 1253163, at *10 (S.D.N.Y. Mar. 24, 2010) (granting summary judgment where the plaintiff failed to follow up on employer's offer to make requested accommodation, which required plaintiff to take additional steps and file supporting documentation); *Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 372 (S.D.N.Y. 2018) (similar).

Thus, the record lacks evidence supporting these claims. It instead reflects that, to the extent Kurtanidze requested accommodations for his claimed disabilities, these were

accommodated. Summary judgment for the defense is thus warranted. *See, e.g., Frilando v. N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501, 515 (S.D.N.Y. 2020) ("Where an employer has already taken or offered measures to accommodate the disability in question, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable." (citation omitted)); *Concepcion v. City of New York*, No. 15 Civ. 2156, 2016 WL 386099, at *16–17 (S.D.N.Y. Jan. 29, 2016) (granting summary judgment where plaintiff did not present evidence that accommodations were inadequate), *aff'd*, 693 F. App'x 31 (2d Cir. 2017).

        *b.*     *COVID-19*

The record also lacks evidence supporting Kurtanidze's claim that Mizuho failed to accommodate requests he made to take time off during COVID-19. The unrefuted evidence is that Mizuho instituted a flexible leave policy, starting after the onset of the pandemic and remaining in effect until 2021, that gave employees unlimited paid sick days. Pl. 56.1 ¶ 241. It also reflects that Mizuho management granted Kurtanidze's sick leave requests and actively encouraged him to care for himself. *See, e.g.*, JSF ¶ 104 ("Yoshida: Hope you could feel a little bit better tomorrow. Please take care of yourself well and let me know how you feel tomorrow morning."). And Kurtanidze has not mustered evidence of any instance in which the company denied a leave request or a request to visit a doctor. *See* Pl. 56.1 ¶ 191 (Q. "But he allowed you to go to the doctor. He didn't say you couldn't go?" A. "Yeah. He didn't refuse me to do things." (brackets removed)).

Summary judgment is thus warranted for Mizuho on the accommodation claims.

      **2.**    **Discrimination**

Kurtanidze next claims Mizuho discriminated against him based on his carpal tunnel syndrome and COVID-19 status.[10]  To prevail on a disability discrimination claim under the NYCHRL, Kurtanidze must again show that he was treated "less well, at least in part for a discriminatory reason." *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 123 (S.D.N.Y. 2020) (quoting *Mihalik*, 715 F.3d at 110 n.8).  On this claim, too, he has failed to adduce evidence on which a finder of fact could so find.

> a.    Carpal tunnel

The record lacks evidence that Kurtanidze was treated differently on the basis of his carpal tunnel syndrome.  As noted, the record reflects that Kurtanidze's accommodation requests were approved without resistance.  And Kurtanidze has not adduced evidence that Willox, who terminated Kurtanidze, knew either about Kurtanidze's carpal tunnel syndrome or any of Kurtanidze's accommodations requests.  He testified that he did not.  JSF ¶¶ 83–84; Pl. 56.1 ¶¶ 214–15; *see Pacenza v. IBM Corp.*, 2009 WL 890060, at *10 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 363 F. App'x 128 (2d Cir. 2010) (disability discrimination claim dismissed where plaintiff "has not demonstrated that his employer—specifically, the supervisor who decided to terminate his employment—was aware of his alleged PTSD disability"); *see also, e.g., Casablanca v. The New York Times Co.*, 16 N.Y.S.3d 791, 791 (N.Y. Sup. Ct. 2015) (granting defendant summary judgment on NYCHRL disability discrimination claim where decisionmaker "attest[ed] that he

---

[10] Kurtanidze's TAC asserted that he was also subjected to a hostile work environment based on his disabilities.  TAC ¶ 134.  But because, in response to the summary judgment argument, he did not defend that claim beyond a perfunctory reference to it without any developed argumentation, that claim is waived. *See Malka*, 602 F. Supp. 3d at 529.  In any event, because the standards for discrimination and hostile work environment are the same under the NYCHRL, that claim, on the merits, rises and falls with the discrimination claim. *See Raji*, 2018 WL 1363760, at *7; *Clarke*, 2013 WL 2358596, at *11.

had no knowledge of plaintiff's alleged disability, nor did he perceive plaintiff to have a disability, at the time the disciplinary letters were given").

Kurtanidze's assertions that he was assigned less-desirable projects on account of carpal tunnel are also meritless. Again, in his self-evaluations during his annual performance reviews for the relevant period, Kurtanidze highlighted his work on various substantive projects in terms inconsistent with having been given less challenging work. Pl. 56.1 ¶ 165. In any event, there is no evidence that would link any such differential treatment to his protected status, *see Lettieri*, 2023 WL 5152447, at *7; nor is there evidence that such tasks fall outside his job description, *see Mihalik*, 715 F.3d at 111 (trivial harms do not sustain a discrimination claim under the NYCHRL). Summary judgment is merited for Mizuho on this claim.

### b.    COVID-19

The record is likewise devoid of evidence that Mizuho discriminated against Kurtanidze on account of his having contracted COVID-19. Kurtanidze's TAC had claimed that Yoshida "threaten[ed] Plaintiff's job, stating that if Plaintiff did not recover [from COVID-19] quickly, his job would be at risk." TAC ¶ 78. But the evidence refuted that claim as untrue. The parties stipulated the following: "Yoshida never told Kurtanidze that, if he did not recover quickly from his reported case of COVID-19, his job would be at risk," JSF ¶ 109; "Yoshida never specifically told Kurtanidze that, if he utilized sick days to which he was entitled, his job would be at risk," *id.* ¶ 110; "Yoshida never specifically told Kurtanidze that if he did not test positive for COVID-19, he would have to return to work notwithstanding his reported symptoms of COVID-19," *id.* ¶ 111; and that "[n]o manager or Human Resources representative at Mizuho ever told Kurtanidze that, if he did not test positive for COVID-19, he would have to return to work

notwithstanding his reported symptoms of COVID-19," *id.* ¶ 112. And, as noted, Kurtanidze's supervisors approved his requests to take time off for illness.

Kurtanidze's generalized claims that Yoshida mistreated him after taking time off for illness do not support this claim. Kurtanidze broadly alleged that Yoshida stopped inviting Plaintiff to meetings relating to his job, substituted the reports he was working on for administrative tasks, and "demanded" evidence in the form of a positive test result from Plaintiff" when he requested time off on account of Kurtanidze's COVID-19 status. Pl. 56.1 ¶¶ 257, 295; TAC ¶¶ 35, 37, 76. But the evidence does not support these characterizations, in that, as reviewed above, (1) there is no evidence that Kurtanidze thereafter was assigned less substantive tasks; (2) there is no evidence that the "administrative tasks" Kurtanidze was assigned fell outside his job description; (3) Yoshida encouraged Kurtanidze to attend to his health after his COVID-19 diagnosis; (4) even had Yoshida "demanded" proof that Kurtanidze had COVID-19, such would have been entirely appropriate in considering a request for leave, and was permissible under Mizuho policy, under which the company "reserves the right to request verification for absences," Pl. 56.1 ¶ 242; and (5) Yoshida approved Kurtanidze's time-off requests for illness.

Summary judgment for Mizuho is also warranted on this claim.

### 3.    Retaliation

Kurtanidze's final claim is that Mizuho retaliated against him for requesting various accommodations for his carpal tunnel syndrome in violation of the FMLA, NYSHRL, and NYCHRL. *See* TAC ¶¶ 121, 134.

#### a.    FMLA

Kurtanidze here asserts "interference" and "retaliation" claims under the FMLA.

i.    Interference

To establish a claim of FMLA interference, a plaintiff must establish that (1) he is an eligible employee under the FMLA, (2) the defendant is an employer as defined by the FMLA, (3) plaintiff was entitled to take leave under the FMLA, (4) plaintiff gave notice to the defendant of his intention to take leave, and (5) plaintiff was denied benefits to which he was entitled under the FMLA. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

On Mizuho's motion to dismiss, *see* Dkt. 30, the Court sustained Kurtanidze's FMLA interference claim on one ground: the complaint's allegation that, in February 2021, Kurtanidze had requested but was denied the "reasonable accommodation of . . . taking breaks throughout the day" to manage the "excruciating pain" he felt in his right wrist. *Kurtanidze*, 2024 WL 1117180, at *14. Although the complaint did not, in contrast to Kurtanidze's other (time-barred) requests, term this request "a request for FLMA leave," the Court construed it as such insofar as "case law and federal regulations make it clear that employees do not need to invoke the FMLA in order to benefit from its protections," *id.* (cleaned up) (citing *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009)), and because "Mizuho d[id] not argue that the fact that Kurtanidze requested 'breaks'—as opposed to 'leave'—is of consequence," *id.* at *14.

With a factual record now developed, however, the evidence makes clear that Kurtanidze cannot establish the fifth element of the *prima facie* case, because he was not denied any benefit to which he was entitled under the FMLA. On the contrary, in April 2020, Kurtanidze's request to "pace out" his workload so that he could take breaks as needed was *approved* by Gavaris, who told Kurtanidze that he was to "let us know as well if the load (at points) is too much for the time that is expected." Pl. 56.1 ¶ 198. Kurtanidze assured Gavaris that he "c[ould] work under much higher workload and do[es]n't mind at all." *Id.* And although Kurtanidze testified that it was

49

difficult for him to take breaks when Yoshida would "keep texting [him]," *id.* ¶ 203, Kurtanidze later admitted in his deposition that working from home, which he did from March 2020 until he was terminated, was a sufficient "accommodation" of his wrist pain, *id.* ¶ 201, 208, 227–36. And, tellingly, after Kurtanidze's break schedule was approved, he "never again raised with either Gavaris or Yoshida the issue of his carpal tunnel syndrome or hand or wrist pain; never again raised the issue of 'pacing out' his work in light of his carpal tunnel syndrome or hand or wrist pain; never told Gavaris or Yoshida that his workload was too heavy in light of pain or numbness in his wrist or hand, or in light of carpal tunnel syndrome; and never told Gavaris that he needed a reduced workload because of pain or numbness in his wrist or hand, or because of carpal tunnel syndrome." *Id.* ¶ 210; JSF ¶¶ 78–80. That defeats his interference claim. *See Kelly v. Hartford Fin. Servs. Grp., Inc.*, 818 F. App'x. 83, 85 (2d Cir. 2020) (interference claim not cognizable where plaintiff "never once applied for leave through the established procedures" and "[n]or does the record otherwise support a conclusion that Defendant interfered with an attempted exercise of [plaintiff's] rights under [the FMLA]").

ii.    Retaliation

Kurtanidze's retaliation claim also lacks sufficient factual support. To establish a *prima facie* case of FMLA retaliation, plaintiff must establish that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *See Potenza*, 365 F.3d at 168.

The only adverse action that survives Mizuho's motion to dismiss[11] is Kurtanidze's April 2021 termination. But the evidence does not support Kurtanidze's claim that his termination was motivated by disability-based animus. The parties agree that supervisor Willox, who terminated Kurtanidze, was unaware of his disability. *See* JSF ¶ 83 ("Kurtanidze never informed Willox that he (Kurtanidze) suffered from carpal tunnel syndrome or hand or wrist pain."); *id.* ¶ 84 ("Kurtanidze never advised Willox that he (Kurtanidze) needed any type of accommodation to address his carpal tunnel syndrome or hand or wrist pain."); *id.* ¶ 85 ("Kurtanidze never presented anyone in management or Human Resources at Mizuho with a note from any doctor regarding his claimed wrist pain, hand pain, or carpal tunnel syndrome."). And there is no basis to infer that the termination was motivated by disability discrimination. It occurred a full year after Kurtanidze's April 2020 request for an accommodation for his carpal tunnel. *See Seabrook v. N.Y.C. Health & Hosps. Corp.*, No. 13 Civ. 4164, 2015 WL 273652, at *8, 10 (S.D.N.Y. Jan. 20, 2015) (granting defendant summary judgment on NYCHRL and NYSHRL claims that employer terminated her in retaliation for seeking accommodation, as the "requests for accommodation were made . . . over a year before her employment was terminated—a temporal gap that further belies a causal connection between her requests for accommodation and her termination.").

The Court thus grants Mizuho summary judgment on this claim.

### b.    *NYSHRL and NYCHRL*

For the reasons canvassed above, there is insufficient evidence to support the claim that Mizuho retaliated against Kurtanidze for his request for disability-related accommodations for

---

[11] As discussed above, *see supra* n.8, the "curtailment" of Kurtanidze's work assignments does not qualify as an adverse action under the FMLA.

carpal tunnel and COVID-19. *See Lulo*, 2022 WL 409224, at *11 (retaliation claims under the

NYSHRL and NYCHRL both fail "for lack of evidence of retaliatory motivation"). Kurtanidze

has not adduced evidence supporting that claim. As reviewed above, Kurtanidze's requests to

"pace out" his workload, Pl. 56.1 ¶ 198, and to take sick leave, *id.* ¶ 191, were granted, and there

is no basis to infer Kurtanidze was terminated, or otherwise retaliated against, for taking such

leave. Summary judgment for Mizuho is merited on these claims.[12]

## CONCLUSION

For the foregoing reasons, the Court grants Mizuho's motion for summary judgment in

full.

SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: July 9, 2025
       New York, New York

---

[12] Although these claims survived the motion to dismiss, Kurtanidze did not defend these claims
on summary judgment, notwithstanding Mizuho's having moved against them. *See* Def. Br. at
33–34. Kurtanidze thus abandoned these claims, *see Malka*, 602 F. Supp. 3d at 529; *Botti*, 711
F.3d at 313, which, in any event, lack an evidentiary basis.